NO. 15-1574

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

————————————

AMERICAN HUMANIST ASSOCIATION; JOHN DOE, as parents and next friends of their minor child; JANE DOE, as parents and friends of their minor child; JILL DOE,

*Plaintiffs - Appellants,*

*v.*

GREENVILLE COUNTY SCHOOL DISTRICT,

*Defendant - Appellee,*

————————————

On Appeal from the United States District Court for the District of South Carolina

————————————————————

## BRIEF OF THE APPELLANTS

————————————————————

Monica Lynn Miller
American Humanist Association
1777 T Street NW, Washington, DC 20009
202-238-9088, Fax: 202-238-9003
Email: mmiller@americanhumanist.org

Aaron Joel Kozloski
Capitol Counsel, LLC
P.O. Box 1996, Lexington, SC 29071
803-465-1400, Fax: 888-513-6021
Email: aaron@capitolcounsel.us

*Attorneys for Appellants*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and Local Rule 26.1, the American Humanist Association is a nonprofit corporation and makes the following disclosure statement:

1. Is party or amicus a publicly held corporation or other publicly held entity? No.

2. Does party/amicus have any parent corporations? No.

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? No

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? No

5. Is party a trade association? No

6. Does this case arise out of a bankruptcy proceeding? No

s/ Monica Lynn Miller

American Humanist Association

July 20, 2015

# TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................... ii

TABLE OF AUTHORITIES ............................................................... v

JURISDICTIONAL STATEMENT ....................................................... 1

STATEMENT OF THE ISSUES .......................................................... 2

STATEMENT OF THE CASE AND RELEVANT FACTS ................................. 3

    Prayer Policy ......................................................................... 4

    Chapel Policy ......................................................................... 7

    Procedural History ................................................................. 10

SUMMARY OF THE ARGUMENT .................................................... 12

ARGUMENT .............................................................................. 15

  I.  STANDARD OF REVIEW ......................................................... 15

  II.  THE PRAYER POLICY IS UNCONSTITUTIONAL ............................... 15

    A. There is no "new" Prayer Policy. ........................................ 19

    B. The Prayer Policy lacks a secular purpose. ........................... 21

      1.  The graduation prayers are intrinsically religious. ................ 21

      2.  The District failed to meet its burden of proving a secular
         purpose. ................................................................. 23

    C. The Prayer Policy has the unconstitutional effect of advancing
      and endorsing religion. ..................................................... 26

1.  A graduation ceremony is not a forum for private speech and graduation prayers are "school sponsored." ................................... 29

2.  A policy prohibiting graduation prayer is required by the Establishment Clause, and does not in any way violate Free Speech. ........................................................................ 32

3.  A policy "permitting" graduation prayers violates the Establishment Clause. ................................................... 33

4.  The "New Position" is facially unconstitutional. ........................... 36

5.  The Prayer Policy is unconstitutional as applied and cannot be meaningfully distinguished from *Santa Fe*. ............................. 37

6.  The court misapplied *Joyner*. ........................................ 41

D. *Adler* is unpersuasive and distinguishable. ........................................... 42

E. The ratio of 2014 prayers is immaterial but not "*de minimis*." ............ 46

F. The Prayer Policy fosters excessive entanglement with religion. ........ 48

III.  THE PRAYER POLICY FAILS THE COERCION TEST. ........................ 49

IV.  THE COURT ERRED IN DISMISSING PLAINTIFFS-APPELLANTS' CHAPEL POLICY CLAIMS. ........................... 51

A. Plaintiffs-Appellants' nominal damage claim is not moot. .................. 51

B. The Does have municipal taxpayer standing. ...................................... 52

V.  THE CHAPEL POLICY IS UNCONSTITUTIONAL. ............................. 55

A. The Chapel Policy has the effect of endorsing religion. ...................... 55

B. The Chapel policy lacks a secular purpose. ........................................... 58

C. The Chapel Policy fails the Coercion Test ........................................... 60

CONCLUSION .................................................................................................... 62

REQUEST FOR ORAL ARGUMENT ................................................................ 62

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*ACLU v. Black Horse Pike Reg'l Bd. of Educ.*, 84 F.3d 1471 (3d Cir. 1996) . passim

*ACLU v. Rabun Cnty. Chamber of Commerce, Inc.*, 698 F.2d 1098 (11th Cir. 1983) ................................................................................................. 59

*Adler v. Duval Cty. Sch. Bd.*, 250 F.3d 1330 (11th Cir. 2001) ....................... passim

*Am. Humanist Ass'n v. Lake Elsinore*, 2014 U.S. Dist. LEXIS 25180 (C.D. Cal. 2014).......................................................................................................... 59

*Anderson v. Laird*, 466 F.2d 283 (D.C. Cir. 1972)................................................ 60

*Appenheimer v. Sch. Bd.*, 2001 WL 1885834 (C.D. Ill. 2001) ....................... passim

*Ashby v. Isle of Wight County Sch. Bd.*, 354 F. Supp. 2d 616 (E.D. Va. 2004) ......... ................................................................................. 17, 30, 33, 34

*Bell v. Little Axe Indep. Sch. Dist.*, 766 F.2d 1391 (10th Cir. 1985) ..................... 48

*Bennett v. Livermore Unified Sch. Dist.*, 193 Cal. App. 3d 1012 (1st Dist. 1987)..... ................................................................................. 18, 22, 34, 48

*Borden v. Sch. Dist.*, 523 F.3d 153 (3d Cir. 2008) ................................................. 18

*Brody v. Spang*, 957 F.2d 1108 (3d Cir. 1992)...................................................... 30

*Capital City Real Estate, LLC v. Certain Underwriters at Lloyd's London*, 2015 U.S. App. LEXIS 9662 (4th Cir. 2015).............................................................. 62

*Capitol Square Review v. Pinette*, 515 U.S. 753 (1995)........................................ 38

*Carlino v. Gloucester City High Sch.*, 57 F. Supp. 2d 1 (D.N.J. 1999)................. 18

*Chandler v. James*, 180 F.3d 1254 (11th Cir. 1999) .............................................. 45

*Chapin Furniture Outlet Inc. v. Town of Chapin*, 252 Fed. App'x 566 (4th Cir. 2007). ................................................................................................. 15

*Child Evangelism Fellowship v. Anderson Sch. Dist. Five*, 470 F.3d 1062 (4th Cir. 2006) ................................................................................................. 31

*Child Evangelism Fellowship v. Montgomery County Pub. Schs*, 373 F.3d 589 (4th Cir. 2004) ................................................................ 30

*Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520 (1993) .............. 39

*Church of Scientology Flag Serv. v. Clearwater*, 2 F.3d 1514 (11th Cir. 1993).... 23

*Cole v. Oroville Union High Sch. Dist.*, 228 F.3d 1092 (9th Cir. 2000) ......... passim

*Collins v. Chandler Unified Sch. Dist.*, 644 F.2d 759 (9th Cir. 1981) ........... passim

*Comm. for Voluntary Prayer v. Wimberly*, 704 A.2d 1199 (D.C. 1997).......... 18, 27

*Corder v. Lewis Palmer Sch. Dist.*, 566 F.3d 1219 (10th Cir. 2009) ... 18, 29, 32, 44

*County of Allegheny v. ACLU*, 492 U.S. 573 (1989) ............................................. 16

*Covenant Media of S.C., LLC v. City of N. Charleston*, 493 F.3d 421 (4th Cir. 2007)................................................................................................................... 52

*Dawkins v. Huffman*, 25 Fed. App'x 107 (4th Cir. 2001) ..................................... 52

*De Spain v. De Kalb Cnty. Comm. Sch. Dist.*, 384 F.2d 836 (7th Cir. 1967)......... 18

*Deveney v. Bd. of Educ. of Kanawha*, 231 F. Supp. 2d 483 (S.D. W.VA. 2002)....... ................................................................................................ 17, 27, 30, 34

*Doe v. Crestwood*, 917 F.2d 1476 (7th Cir. 1990). ............................................... 27

*Doe v. Duncanville Indep. Sch. Dist.*, 994 F.2d 160 (5th Cir. 1993)..................... 17

*Doe v. Elmbrook Sch. Dist.*, 687 F.3d 840 (7th Cir. 2012)............................. passim

*Doe v. Gossage*, 2006 U.S. Dist. LEXIS 34613 (W.D. Ky. 2006)................. passim

*Doe v. Santa Fe Indep. Sch. Dist.*, 168 F.3d 806 (5th Cir. 1999)................... passim

*Doe v. Sch. Bd.*, 274 F.3d 289 (5th Cir. 2001)...................................................... 18

*Doe v. Sch. Dist. of City of Norfolk*, 340 F.3d 605 (8th Cir. 2003) ................. 48, 49

*Does 1 v. Elmbrook Joint Common Sch. Dist.*, 2010 U.S. Dist. LEXIS 72354 (E.D. Wis. 2010) ........................................................................................................ 53

*Does v. Enfield Pub. Schools*, 716 F. Supp. 2d 172 (D. Conn. 2010) ............. passim

*Doremus v. Board of Educ. of Hawthorne*, 342 U.S. 429 (1952)........................... 54

*Edwards v. Aguillard*, 482 U.S. 578 (1987). ................................................ 15, 16

*Engel v. Vitale*, 370 U.S. 421 (1962) ....................................................... 17

*Everson v. Bd. of Educ.*, 330 U.S. 1 (1947). ............................................... 60

*Farrar v. Hobby*, 506 U.S. 103 (1992) .................................................... 52

*Gearon v. Loudoun Cnty. Sch. Bd.*, 844 F. Supp. 1097 (E.D. Va. 1993) ........ passim

*Good News Club v. Milford Cent. Sch.*, 533 U.S. 98 (2001) ................................ 31

*Graham v. Cent. Cmty. Sch. Dist.*, 608 F. Supp. 531 (S.D. Iowa 1985)................ 18

*Hall v. Bradshaw*, 630 F.2d 1018 (4th Cir. 1980) ....................................... passim

*Harris v. Joint School Dist.*, 41 F.3d 447 (9th Cir. 1994) .............................. passim

*Harvey v. Cobb Cnty.*, 811 F. Supp. 669 (N.D. Ga. 1993) .................................. 53

*Hawley v. Cleveland*, 773 F.2d 736 (6th Cir. 1985) ..................................... 54

*Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988) ................................. 30

*Holloman v. Harland*, 370 F.3d 1252 (11th Cir. 2004) ........................... 22, 44, 59

*Ingebretsen v. Jackson Pub. Sch. Dist.*, 88 F.3d 274 (5th Cir. 1996)................... 23

*Jackson v. Hill*, 569 Fed. App'x 697 (11th Cir. 2014) ................................... 52

*Jager v. Douglas Cnty. Sch. Dist.*, 862 F.2d 824 (11th Cir. 1989)................. 18, 23

*Joyner v. Forsyth Cnty.*, 653 F.3d 341 (4th Cir. 2011)..................... 34, 41, 42, 43

*Karen B. v. Treen*, 653 F.2d 897 (5th Cir. 1981)..................................... 17, 18, 59

*Koenick v. Felton*, 190 F.3d 259 (4th Cir. 1999). ....................................... 53

*Larkin v. Grendel's Den*, 459 U.S. 116 (1982) ......................................... 56

*Lassonde v. Pleasanton Unified Sch. Dist.*, 320 F.3d 979 (9th Cir. 2003)...... passim

*Lee v. Weisman*, 505 U.S. 577 (1992) .................................................... passim

vii

*Lemke v. Black*, 376 F. Supp. 87 (E.D. Wis. 1974) ......................................... 55, 61

*Lundberg v. W. Monona Cmty. Sch. Dist.*, 731 F. Supp. 331 (N.D. Iowa 1989) ............................................................................................................. passim

*Mangold v. Albert Gallatin Area Sch. Dist.*, 438 F.2d 1194 (3d Cir. 1971).......... 18

*McCreary County v. ACLU*, 545 U.S. 844 (2005).......................................... passim

*Mellen v. Bunting*, 327 F.3d 355 (4th Cir. 2003)............................................ passim

*Meltzer v. Bd. of Pub. Instruction,* 548 F.2d 559 (5th Cir. 1977)......................... 18

*Musgrove v. Sch. Bd.*, 608 F. Supp. 2d 1303 (M.D. Fla. 2005)..................... 55, 61

*Newman v. East Point*, 181 F. Supp. 2d 1374 (N.D. Ga. 2002) ............................ 53

*N.C. Civil Liberties Union v. Constangy*, 947 F.2d 1145 (4th Cir. 1991) ................
........................................................................................................ 21, 22, 26, 48

*Nurre v. Whitehead*, 580 F.3d 1087 (9th Cir. 2009)........................................ 18, 46

*Peck v. Upshur Cnty. Bd. of Educ.*, 155 F.3d 274 (4th Cir. 1998) ............ 31, 40, 45

*Pelphrey v. Cobb Cnty.*, 547 F.3d 1263, 1267 (11th Cir. 2008)............................ 53

*Pleasant Grove City, Utah v. Summum*, 555 U.S. 460 (2009) .............................. 32

*Reimann v. Fremont County Joint Sch. Dist*, 1980 WL 590189 (D. Idaho 1980).. 55

*Rendelman v. Rouse*, 569 F.3d 182 (4th Cir. 2009).............................................. 52

*S.D. v. St. Johns Cnty. Sch. Dist.*, 632 F. Supp. 2d 1085 (M.D. Fla. 2009)........... 18

*Sahagian v. Dickey*, 827 F.2d 90 (7th Cir. 1987) .................................................. 52

*Sands v. Morongo Unified Sch. Dist.*, 53 Cal. 3d 863  (1991) ............. 18, 27, 34, 48

*Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290 (2000) ................................ passim

*Sch. Dist. Abington v. Schempp*, 374 U.S. 203 (1963) .......................................... 17

*Skarin v. Woodbine Cmty. Sch. Dist.*, 204 F. Supp. 2d 1195 (S.D. Iowa 2002) .....
.................................................................................................................... passim

*Smith v. County of Albemarle*, 895 F.2d 953 (4th Cir. 1990) ............................ 56, 58

*Smith v. Jefferson County Bd. of Sch. Comm'rs*, 641 F.3d 197 (6th Cir. 2011) ..... 55

*Spacco v. Bridgewater Sch. Dep't*, 722 F. Supp. 834 (D. Mass. 1989)...... 55, 56, 61

*Stone v. Graham*, 449 U.S. 39 (1980)................................................................. 21

*Thompson v. Life Ins. Co. of N. Am.*, 30 Fed. App'x 160 (4th Cir. 2002)............. 62

*Town of Greece v. Galloway*, 134 S. Ct. 1811 (2014)........................................... 17

*Turner v. City Council*, 534 F.3d 352 (4th Cir. 2008) ..................................... 16, 30

*Wallace v. Jaffree*, 472 U.S. 38 (1985)................................................................ 17

*Warnock v. Archer*, 443 F.3d 954 (8th Cir. 2006)............................................... 18

*Washegesic v. Bloomingdale Pub. Sch.*, 33 F.3d 679 (6th Cir. 1994)................... 57

*Westfarm Assocs. Ltd. P'shp v. Washington Suburban Sanitary Comm'n*, 66 F.3d 669 (4th Cir. 1995). ........................................................................................ 15

*Wigg v. Sioux Falls Sch. Dist.*, 382 F.3d 807 (8th Cir. 2004). ............................. 49

*Workman v. Greenwood Cmty. Sch. Corp.*, 2010 U.S. Dist. LEXIS 42813 (S.D. Ind. 2010) .................................................................................................. passim

## Statutes and Constitution

28 U.S.C. § 1291 ................................................................................................... 1

28 U.S.C. § 1331 ................................................................................................... 1

28 U.S.C. § 1343 ................................................................................................... 1

42 U.S.C. § 1983 ................................................................................................... 1

U.S. CONST. amend. I. ................................................................................... passim

# JURISDICTIONAL STATEMENT

Plaintiffs-Appellants, American Humanist Association ("AHA"), Jane, Jill, and John Doe, appeal the district court's denial of their Motion for Summary Judgment on their claims: (1) for a permanent injunction against Defendant-Appellee Greenville County School District's ("District") graduation prayer policy ("Prayer Policy"), allowing speakers to lead a captive audience in prayer; and (2) for a permanent injunction, declaratory relief, and nominal damages against the District's graduation chapel-venue policy ("Chapel Policy").

On May 11, 2015, the court granted Defendant-Appellee's Cross-Motion for Summary Judgment and denied Plaintiffs-Appellants' Motion on all Chapel Policy claims. (Doc.96). On May 18, it granted Plaintiffs-Appellants' Motion, in part, on the Prayer Policy as applied from 1951 through 2013, but granted Defendant-Appellee's Cross-Motion on the same Prayer Policy as purportedly practiced after 2013. (Doc.98). On May 26, pursuant to FED. R. APP. P. 3, Plaintiffs-Appellants timely filed their Notice of Appeal from the final judgment. (Doc.99; Doc.104).

This Court has jurisdiction pursuant to 28 U.S.C. § 1291. The District Court had jurisdiction pursuant to 28 U.S.C. § 1331 and § 1343 because this action involves constitutional claims brought under 42 U.S.C. § 1983.

## STATEMENT OF THE ISSUES

1.    Whether the District's prayer practice, which authorizes the delivery of Christian prayers to captive audiences at school-organized, school-sponsored graduation ceremonies, violates the Establishment Clause, and specifically:

   a.  Whether the court, after finding the District's longstanding Prayer Policy unconstitutional, erred in upholding the Prayer Policy as currently described by the district, which continues to authorize proselytizing Christian prayers before captive audiences at school-sponsored events;

   b.  Whether the court erred by failing to apply the coercion test and by disregarding the practical effects of the Prayer Policy;

2.    Whether: (a) holding elementary school graduations and holiday concerts in a proselytizing Christian chapel at a Christian university violates the Establishment Clause; and if so, whether the court erred in: (b) refusing to award nominal damages; and (c) holding plaintiffs' nominal damages claim moot.

3.    Whether the court erred in holding that municipal taxpayers lack standing to seek an injunction against a practice of holding elementary school events in a proselytizing Christian environment, where municipal funds, including materials and personnel time, are expended to support the practice.

## STATEMENT OF THE CASE AND RELEVANT FACTS

Plaintiffs Jill Doe and her family are non-Christians, Humanists who do not believe in gods. (Joint Appendix ["J.A."] 14-15¶¶6-10; 143-147; 203; 205; 214). On May 30, 2013, Jill was a fifth grader at Mountain View Elementary School ("MVES"). (*Id.*). Jill participated in, and her parents attended, an MVES graduation ceremony held in a Christian chapel at a Christian university that included two Christian prayers. (*Id.*). Jill and her youngest brother continue to attend District schools. (J.A.848).[1]

The District has a longstanding practice, going back to 1951, of endorsing Christian prayers at graduations, including those for elementary children. (J.A.76¶3; 363; 568-577, 876). Since 2012, it has been holding elementary school graduations and holiday concerts in a proselytizing Christian venue. (J.A.16¶14; 120¶14; 76-77¶8; 400; 417; 568-577).

To vindicate their Frist Amendment rights, Plaintiffs-Appellants filed a Verified Complaint on September 11, 2013, against the District, challenging two District practices as violative of the Establishment Clause: (1) its longstanding practice of authorizing prayer in school-sponsored graduation ceremonies to captive audiences ("Prayer Policy"); (2) its practice of holding elementary school

---

[1]    Jill attends Beck Academy Middle and her youngest brother attends Mauldin Elementary. (J.A.848¶¶4-5; 857; 877). Beck Academy feeds into J.L. Mann High, Wade Hampton High, and Southside High. (J.A.877).

3

graduations and holiday concerts in a proselytizing Christian environment. ("Chapel Policy"). (Doc.1) They seek injunctive and declaratory relief, and nominal damages for each claim. (*Id.*)

**Prayer Policy**

Since 1951, Christian prayers have been included at graduation ceremonies for elementary children at MVES. (J.A.76¶3; 363; 568-577, 876). The ceremonies take place during school hours and last about two hours. (*Id.*). Students receive awards and several children are chosen to speak. (*Id*). Students are under the supervision and direction of the school. (J.A.19¶¶49-51; 123¶¶49-51). They are told what to wear, where to sit, and practice walking to their places. (*Id.*). Parents are invited to attend. (J.A.90-92; 116). The ceremony is described as an "educational trip." (*Id.*).

Two prayers are included each ceremony, one after the opening remarks and the other at the ceremony's conclusion. (J.A.363; 568-577). The prayers are always Christian. (J.A.366). School officials select the graduation speakers, generally based on "ability to speak in front of a group" or "citizenship criteria." (J.A.79¶17; 366). Prior to this lawsuit, teachers reviewed and approved the content of the prayers and the prayers were mentioned on the graduation programs. (J.A.19-20¶¶52-54; 123¶¶52-54; 366-67).

The 2013 MVES ceremony included two student-led Christian prayers and was held in a Christian chapel. (J.A.18-19; 123¶47; 366-67). Jill Doe saw her peers bowing their heads during the prayers. (J.A.203¶3). Although against her sincerely held convictions, Jill bowed her head too. She was afraid she would be in trouble if she did not participate and did not want to stand out. (*Id.*). The Doe parents witnessed teachers, parents, and students participating in the prayers. They raised Jill as a non-theist and felt she was coerced into participating in the prayer. (J.A. 205¶5; 214¶6).

The District's practice of including prayers in graduation ceremonies is District-wide. (J.A.148-49; 399-409; 412-18; 422-524; 578-611). Many of its schools include graduation prayers. (*Id.*). Such schools include, but are certainly not limited to: BRMS; Blue Ridge High School ("BRHS"); East North Street Elementary; Gateway Elementary (since at least 2001); Washington Center (since at least 2008); J.L. Mann High (since at least 2009); Eastside High (since at least 2008); Woodmont High (since at least 2005); Hillcrest High; Wade Hampton High; Greenville High Academy; Greer High; Berea High; Carolina High School & Academy; Greenville Senior High; and Riverside High. (*Id.*) (*See also* J.A.316-323). At the 2011 BRMS ceremony, a teacher delivered the prayer. (J.A.413-414).[2]

---

[2] Defendant-Appellee initially refused to produce any evidence of its other school's practices. However, after filing a motion to compel, Plaintiffs-Appellants obtained a randomized sample of evidence. (J.A.9-10; 239-254; 377; 399).

It is undisputed that in the vast majority of these schools, the prayer-givers are selected by the school, often based on ability to publicly speak, "citizenship criteria," class rank, or class office. (J.A.883-84). In most of these schools, the "prayer" is listed on the program, and often, attendees are instructed to stand for the prayer. (*Id.*). In several schools, men are even required to remove their caps. (*Id.*).

Among the schools that authorize graduation prayers are those Doe children will attend. (J.A.148; 400-401; 601-607) For instance, the 2013 J.L. Mann ceremony included an "invocation" and "benediction" by the "senior class vice-president" and "senior class president," respectively. (J.A.502-504). In addition to including two Christian prayers, the 2013 Wade Hampton High graduation included a performance of "The Lord Bless You and Keep You." (J.A.318; 519).

In addition to MVES, Gateway Elementary has included graduation prayers since at least 2001. (J.A.405; 416; 426-31). Teachers select the prayer-givers based on those who volunteer. The invocations are listed on the programs and the audience is asked to stand. (*Id.*). East North Street Elementary also includes prayers by school-selected fifth graders. (J.A.412-414; 423). Washington Center, a special education school, has included graduation prayers delivered by teacher-selected students since at least 2008. (J.A.401; 413; 583-588).

The District does not deny that it has had a longstanding practice of "endorsing" Christian graduation prayers. (J.A.33-34; 35-37; 79-80¶17).

On June 25, 2013, the District responded to AHA's cease-and-desist letter, writing in part: "the District will not prohibit this practice as long as the prayer or ['religious'] message is student-led and initiated and does not create a disturbance to the event." (J.A.36). Consequently, Plaintiffs-Appellants filed suit.

The District-wide prayer practices have continued since this lawsuit has been filed. In 2014, Wade Hampton High included a prayer by the student body president, as in prior years. The program instructed the audience to stand for an "inspirational reading" which was a prayer. (J.A.520-521). East North Street Elementary included a prayer by a school-selected student, as in prior years. (J.A.423). The 2014 BRHS ceremony included a Christian prayer by the senior class vice president. The program directed the audience to stand for "closing remarks" which was a prayer. (J.A.414; 463-65). The Superintendent presided over the event (*Id.*).[3]

**Chapel Policy**

Despite a variety of viable secular venues, including the gymnasiums, auditoriums, and fields at the District's 100 schools, Defendant-Appellee insists on

---

[3] Notably, of the three requests for admissions that specifically inquired about 2014 ceremonies, Defendant-Appellee "denied" a prayer was delivered at the BRHS graduation when one was in fact delivered. (J.A.399-409; 414).

holding elementary school functions in a proselytizing Christian environment and has made no plans for an alternative venue. (J.A.16¶14; 120¶14; 371-72; 408-409; 417; 568-575).

Specifically, since May 2012, MVES graduations have been held in a Christian chapel, Turner Chapel, in the center of a Christian university, North Greenville University ("NGU"). (*Id*). Tigerville Elementary has started using Turner Chapel for its holiday concerts and intends to do so indefinitely. (J.A.417). Children are transported to and from Turner Chapel in school-funded buses under the supervision of faculty. (J.A.92-97; 351-52¶¶44-45; 360-61¶¶46-48; 395).

NGU is affiliated with the Southern Baptist Convention. (J.A.16¶18; 121¶18). NGU's slogan is "Christ Makes the Difference." (J.A.16¶21; 121¶21; 618; 658).

Turner Chapel is a Christian place of worship. (J.A.17¶26; 121¶26). It is a place where, according to NGU, "[m]any students have received Jesus Christ as their personal Lord and Savior," "evangelism" is a focus, and "students are exposed to the truth of the gospel of Jesus Christ." (J.A.16¶17; 121¶17).

Attendees are directly exposed to numerous Christian symbols and fixtures, both inside and outside of the chapel. (J.A.552; 613-730; 807). A Christian cross sits atop Turner Chapel, which children must pass beneath to enter the sanctuary. (*Id*). A cross also sits atop the Hayes Ministry Center, visible from the chapel and

highway. (*Id.*642-649; 783). A large cross affixed to the Todd Prayer Chapel is visible en route to Turner Chapel. (J.A.259-261).

At the entranceways to Turner Chapel are several large doormats prominently featuring NGU's slogan, "Christ Makes The Difference" with a Christian cross in the center. (J.A.613-621). Surrounding the entire interior of the chapel are eight large stained glass windows of overtly Christian Biblical scenes, each featuring Jesus Christ (including his birth, crucifixion, and resurrection). (J.A.623-640).

Large permanent signs bearing NGU's Christian logo and slogan mark each campus entranceway. (J.A.713-730). NGU's logo and slogan pervasively line the road leading up to the chapel and are prominently featured on adjacent buildings. (J.A.647-48; 656-58; 660-61; 665; 690-709). At the Turner Chapel parking lot, a large brick wall reads: "North Greenville University Where Christ Makes the Difference." (J.A.707).

Several proselytizing Christian monuments surround Turner Chapel, including "Gethsemane," featuring Jesus praying, "Fishers of Men," featuring Jesus holding a casting net, "Divine Servant," featuring Jesus washing Peter's feet, and a giant Christian sculpture of two bronze Bibles. (J.A.660-61; 667-686). The Does encountered each at the MVES ceremony. (J.A.203-221).

9

It is obviously feasible to use a venue free from religious iconography. (J.A.18¶¶31-36; 122¶¶31-35; 371-72; 408). For instance, BRMS has a gymnasium used for its eighth grade graduations and is only 3 miles away. (J.A.408).

**Procedural History**

After filing suit on September 11, 2013, Plaintiffs-Appellants filed a motion for preliminary injunction on September 16, to enjoin Defendant-Appellee from including prayers in school-sponsored ceremonies and from holding school-sponsored events in religious venues. (Doc.5). They also filed a motion to proceed anonymously. (Doc.6). On December 3, 2013, the court (Judge Anderson) held a hearing at which he called the uncontroverted pleadings "slanderous per se" and accused Plaintiffs-Appellants of making "wild allegations." (Doc.32, Trans.11-12¶¶24-25; 21¶9). The court denied both motions. (Doc.26)

 On December 12, Plaintiffs-Appellants appealed. (Doc.29).  On May 16, 2014, this Court vacated and remanded and granted Plaintiffs-Appellants' motion for a judicial reassignment. (Docs.51-52). On June 9, the case was reassigned to Judge Lewis (Doc.54), who directed the parties to brief whether "Plaintiffs' claims for injunctive and declaratory relief are now moot." (Doc.55). On June 21, Plaintiffs-Appellants filed a memorandum demonstrating that their claims were not moot. (Docs.56-61). Shortly thereafter, the case was reassigned to Judge Hendricks. (Doc.63).

On June 12, Plaintiffs-Appellants served Defendant-Appellee Requests for Admissions, seeking information about prayers at a sample of schools. (J.A.377-397). On July 31, Defendant-Appellee refused to respond to most of the requests. (*Id.*). On August 17, Plaintiffs-Appellants filed a Motion to Determine Sufficiency of Defendant's Responses. (Doc.74). The court denied the motion without prejudice. (Doc.75). On August 25, the court held a telephonic conference, advising Plaintiffs-Appellants to narrow their requests and Defendant-Appellee to respond accordingly. (*Id.*).

On August 21, the court referred Plaintiffs-Appellants' motions to a magistrate. (Doc.77). On August 25, the unopposed motion to proceed anonymously was granted. (Doc.79).

On February 4, 2015, Plaintiffs-Appellants filed their Motion for Summary Judgment on all claims against the Prayer Policy and the Chapel Policy. (Doc.84).

On February 18, the magistrate recommended "that Plaintiffs' motion for a preliminary injunction be denied with respect to Defendants' use of Turner Chapel[.]" (Doc.86). The magistrate held the Prayer Policy moot. (*Id.*). On February 23, Plaintiffs-Appellants timely filed their objections. (Doc.87).

On March 13, Defendant-Appellee filed its Cross-Motion for Summary Judgment. (Doc.89).

On March 19, the court affirmed the denial of the preliminary injunction but on different grounds. (Doc.90).

The court bifurcated the summary judgment claims. (Doc.96). On May 11, it denied Plaintiffs-Appellants' Motion and granted Defendant-Appellee's Cross-Motion on the Chapel Policy claims. (Doc.96). On May 18, the court ruled on the Prayer Policy, holding: "plaintiffs['] motion is GRANTED as to the practice of graduation prayers from 1951 through the 2013 MVES graduation. … The defendant[']s new position on prayer at graduations … is not enjoined, and the plaintiff[s'] motion, as to it, is DENIED. The defendants motion for summary judgment is, likewise … GRANTED[.]" (Doc.97).

On May 26, Plaintiffs-Appellants timely filed their appeal. (Doc.99).

## SUMMARY OF THE ARGUMENT

This case is about a school district's longstanding and ongoing practice of including Christian prayers in school-sponsored graduation ceremonies and its practice of holding events for impressionable elementary students in a proselytizing Christian venue. Both practices are unconstitutional and will continue unless this Court reverses.

In upholding the Prayer Policy, the court made a number of errors, starting with the fact that it treated it as two separate policies. There is only one Prayer Policy – the District's *longstanding practice* of authorizing prayers in school-

sponsored ceremonies. Yet the court interpreted the District's 2013 letter as the "new policy." To be perfectly clear, this letter, if anything, simply codifies the longstanding practice by confirming that the District expressly authorizes "prayer" and "religious messages."

So, in the absence of injunctive relief, the District will continue to authorize children to deliver proselytizing Christian prayers at school-organized graduations to a captive audience assembled at the government's behest. The only modifications it claims to have made (via a principal's affidavit) are that the prayers at *MVES* will no longer be pre-reviewed and that the program will not mention prayers. Neither of these minor gestures suffices to remove the school's imprimatur over the prayers nor do they insulate the school from the coercive element of the final message.

In fact, because the 2013 statement explicitly approves "prayer," it is facially unconstitutional pursuant to *Santa Fe*.

The court also erred by turning a blind eye to its practical effects. The court studiously ignored the fact that the effect of any prayer will unconstitutionally endorse religion and coerce those in attendance to participate. Critically, the court erred by failing to even apply the coercion test.

The court also erred in upholding the Prayer Policy under the *Lemon* purpose prong, as it failed to take into account its history and sequence of events.

The purpose of the Prayer Policy, and the recent decision to continue to authorize graduation prayers, is unquestionably religious.

The court eschewed applying this Court's decisions on government prayer, and also ignored highly persuasive federal court cases, opting instead for an outlier in the Eleventh Circuit (*Adler*). *Adler* contravenes *Santa Fe* as well as this Court's rulings. Regardless, *Adler* is completely inapposite. For one thing, *Adler* only involved a facial challenge; the Eleventh Circuit explicitly refused to consider the policy as-applied. Even on its face, the 2013 position could not survive *Adler* because of its use of "code words," such as "prayer," and because schools select the graduation speakers and will censor remarks that "create a disturbance."

The court's conclusion that enjoining graduation prayers would violate Free Speech is untenable. Numerous courts have rejected this very argument, including the Supreme Court.

The court dismissed all of Plaintiffs-Appellants' claims against the Chapel Policy as moot. This was erroneous. First, it disregarded Plaintiffs-Appellants' nominal damages claim, which by definition, cannot be moot. Therefore, it was incumbent upon the court to determine whether the Chapel Policy was unconstitutional. Second, it erred in holding that Plaintiffs-Appellants lack municipal taxpayer standing. It is undisputed that municipal funds are expended on Turner Chapel ceremonies. That District revenue from a variety of sources funds

the ceremonies is irrelevant. Moreover, taxpayer funds in the form of personnel time and materials are expended on the ceremonies. As such, Plaintiffs-Appellants' chapel claims were erroneously dismissed. Had the court properly evaluated the Chapel Policy, it would have held it unconstitutional under the *Lemon* and coercion tests.

## ARGUMENT

### I.  STANDARD OF REVIEW

In reviewing a grant of summary judgment, the Court "must apply a *de novo* standard of review, drawing all reasonable inferences in favor of the nonmoving party." *Westfarm Assocs. Ltd. P'shp v. Washington Suburban Sanitary Comm'n*, 66 F.3d 669, 678 (4th Cir. 1995). The Court also reviews "*de novo* a district court's ruling … on mootness." *Chapin Furniture Outlet Inc. v. Town of Chapin*, 252 Fed. App'x 566, 569 (4th Cir. 2007).

### II.  THE PRAYER POLICY IS UNCONSTITUTIONAL.

The Supreme Court "has been particularly vigilant in monitoring compliance with the Establishment Clause in elementary and secondary schools." *Edwards v. Aguillard*, 482 U.S. 578, 583-84 (1987). It has specifically held that student-initiated prayers at school-sponsored events unconstitutionally endorse religion and that prayers delivered at graduation ceremonies and football games unconstitutionally coerce students to participate in religious activity. *Santa Fe*

*Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 308 (2000); *Lee v. Weisman*, 505 U.S. 577, 590-92 (1992).

To comply with the Establishment Clause, a practice must pass the *Lemon* test, pursuant to which it must: (1) have a secular purpose; (2) not have the effect of advancing or endorsing religion; and (3) not foster excessive entanglement with religion. *Cnty. of Allegheny v. ACLU*, 492 U.S. 573, 610, 592 (1989). Government action "violates the Establishment Clause if it fails to satisfy any of these prongs." *Edwards*, 482 U.S. at 583.

In addition, in *Lee*, the Court formulated the "coercion test," declaring, "*at a minimum*, the [Establishment Clause] guarantees that government may not coerce anyone to support or participate in religion or its exercise." 505 U.S. at 587 (emphasis added). A nonsectarian graduation prayer failed this test. *Id.* This Court has adopted the coercion test and applies it separate from *Lemon*. *See Mellen v. Bunting*, 327 F.3d 355, 367, 370-72 (4th Cir. 2003). *See also Turner v. City Council*, 534 F.3d 352, 355 (4th Cir. 2008) ("*Lee* established that government cannot compel students to participate in a religious exercise as part of a school program.").

There is a long line of Supreme Court cases "of considerable parentage that prohibits prayer in the school classroom or environs." *Doe v. Duncanville Indep.*

*Sch. Dist.*, 994 F.2d 160, 165 (5th Cir. 1993).[4] The Court recently reiterated that "[g]overnment is prohibited from prescribing prayers to be recited in our public institutions[.]" *Town of Greece v. Galloway*, 134 S. Ct. 1811, 1822 (2014). This is especially so "in the context of a graduation[.]" *Id.* at 1827 (citing *Lee*). In such a setting, "a religious invocation [i]s coercive as to an objecting student." *Id.*

The courts have been nearly unanimous in concluding that graduation prayers are unconstitutional, even if student-initiated and student-led. *See Lee*, 505 U.S. 577; *Doe v. Santa Fe Indep. Sch. Dist.*, 168 F.3d 806 (5th Cir. 1999), *aff'd*, 530 U.S. 290 (2000); *Lassonde v. Pleasanton Unified Sch. Dist.*, 320 F.3d 979 (9th Cir. 2003); *Cole v. Oroville Union High Sch. Dist.*, 228 F.3d 1092 (9th Cir. 2000); *ACLU v. Black Horse Pike Reg'l Bd. of Educ.*, 84 F.3d 1471 (3d Cir. 1996); *Harris v. Joint Sch. Dist.*, 41 F.3d 447 (9th Cir. 1994), *vacated on other grounds*, 515 U.S. 1154 (1995), 62 F.3d 1233 (9th Cir. 1995); *Workman v. Greenwood Cmty. Sch. Corp.*, 2010 U.S. Dist. LEXIS 42813 (S.D. Ind. 2010); *Doe v. Gossage*, 2006 U.S. Dist. LEXIS 34613 (W.D. Ky. 2006); *Ashby v. Isle of Wight Cnty. Sch. Bd.*, 354 F. Supp. 2d 616 (E.D. Va. 2004); *Deveney v. Bd. of Educ. of Kanawha*, 231 F. Supp. 2d 483 (S.D. W.VA. 2002); *Skarin v. Woodbine Cmty. Sch. Dist.*, 204 F. Supp. 2d 1195 (S.D. Iowa 2002); *Appenheimer v. Sch. Bd.*, 2001 WL 1885834 (C.D. Ill.

---

[4] *See Wallace v. Jaffree*, 472 U.S. 38 (1985); *Sch. Dist. Abington v. Schempp*, 374 U.S. 203 (1963); *Engel v. Vitale*, 370 U.S. 421 (1962); *Karen B. v. Treen*, 653 F.2d 897 (5th Cir. 1981), *aff'd*, 455 U.S. 913 (1982).

2001); *Gearon v. Loudoun Cnty. Sch. Bd.*, 844 F. Supp. 1097 (E.D. Va. 1993);

*Lundberg v. W. Monona Cmty. Sch. Dist.*, 731 F. Supp. 331 (N.D. Iowa 1989);

*Graham v. Cent. Cmty. Sch. Dist.*, 608 F. Supp. 531 (S.D. Iowa 1985); *Comm. for*

*Voluntary Prayer v. Wimberly*, 704 A.2d 1199 (D.C. 1997); *Sands v. Morongo*

*Unified Sch. Dist.*, 53 Cal. 3d 863 (1991); *Bennett v. Livermore Unified Sch. Dist.*,

193 Cal. App. 3d 1012 (1st Dist. 1987). *See also Nurre v. Whitehead*, 580 F.3d

1087, 1098 (9th Cir. 2009); *Corder v. Lewis Palmer Sch. Dist.*, 566 F.3d 1219,

1231 (10th Cir. 2009); *Warnock v. Archer*, 443 F.3d 954 (8th Cir. 2006); *Carlino*

*v. Gloucester City High Sch.*, 57 F. Supp. 2d 1 (D.N.J. 1999), *aff'd* 44 Fed. App'x

599 (3d Cir. 2002).

Courts have also ruled that prayers delivered in classrooms,[5] assemblies,[6]

and athletic events[7] violate the Establishment Clause.

As a result of this well-settled jurisprudence, "a constitutional violation

inherently occurs when, in a secondary school graduation setting, a prayer is

---

[5] *Doe v. Sch. Bd.*, 274 F.3d 289, 294 (5th Cir. 2001); *Treen*, 653 F.2d at 902; *Meltzer v. Bd. of Pub. Instruction*, 548 F.2d 559 (5th Cir. 1977); *Mangold v. Albert Gallatin Area Sch. Dist.*, 438 F.2d 1194 (3d Cir. 1971); *De Spain v. De Kalb Cnty. Comm. Sch. Dist.*, 384 F.2d 836 (7th Cir. 1967)

[6] *Collins v. Chandler Unified Sch. Dist.*, 644 F.2d 759 (9th Cir. 1981); *S.D. v. St. Johns Cnty. Sch. Dist.*, 632 F. Supp. 2d 1085 (M.D. Fla. 2009)

[7] *Santa Fe*, 530 U.S. at 303; *Duncanville*, 994 F.2d 160; *Borden v. Sch. Dist.*, 523 F.3d 153 (3d Cir. 2008); *Jager v. Douglas Cnty. Sch. Dist.*, 862 F.2d 824 (11th Cir. 1989)

offered, regardless of who makes the decision that the prayer will be given and who authorizes the actual wording of the remarks." *Gearon*, 844 F. Supp. at 1099.

In upholding the prayer practice, the court below relied exclusively on one outlier case. It completely ignored the coercion test, failed to meaningfully apply the *Lemon* purpose prong, disregarded the practical effects of the policy, and placed substantial weight on immaterial facts in the vain attempt to distinguish *Santa Fe*. As discussed below, the Prayer Policy unequivocally violates the Establishment Clause pursuant to both the *Lemon* and coercion tests.

### A. There is no "new" Prayer Policy.

It is important to clarify at the outset what is meant by the "Prayer Policy." There is only one. The court properly held that prayers delivered at graduations from 1951 through 2013 were unconstitutional. The District does not even deny it has had a practice of "endorsing" Christian prayers all these years, *supra*. In 2013, it *refused* to discontinue this practice, writing: "With regard to a student delivering a **prayer** or providing a **religious message during a school sponsored event**, the District will not prohibit this practice as long as the **prayer or message** is student led and initiated and does not create a disturbance to the event." (J.A.36) (emphasis added).

Inexplicably, the court interpreted this letter as the District's "amended [] position on prayer and religious content at graduation." (J.A.884). To be clear,

19

although the term "Prayer Policy" is used for concision, the District has never had a written prayer policy, and still does not have one. More accurately, it has had a longstanding practice of authorizing graduation prayers, and it is that *practice* Plaintiffs-Appellants' challenge. *E.g.*, *Appenheimer*, 2001 WL 1885834, at *1-6 (unwritten practice permitting student-initiated prayers unconstitutional).

Though Defendant-Appellee now claims to have a "new policy," (i.e. the 2013 letter), the *sine qua non* of the Prayer Policy remains unchanged – the District continues to authorize prayers delivered to captive audiences at government-organized-and-sponsored ceremonies. For all practical purposes, the 2013 statement "amends" nothing. Even the court acknowledged it "is no policy at all[.]" (J.A.891 n.3). The only material difference now is that there is written authorization for the longstanding unconstitutional practice.

Nevertheless, the court accepted the District's superficial argument that prayers will no longer be "school-endorsed." But the only modifications the District claims to have made, through a principal's affidavit and nothing more, is that prayers at *MVES* will no longer be pre-reviewed and the program will not mention prayers. (J.A.76-79). As discussed below, neither of these minor gestures removes the school's imprimatur over the prayers; nor do they insulate the school from the coercive element of the final message. *Santa Fe*, 530 U.S. at 302-03.

### B. **The Prayer Policy lacks a secular purpose.**

#### 1. **The graduation prayers are intrinsically religious.**

The Court looks "first to the question whether the challenged state action reflects a secular purpose." *Hall v. Bradshaw*, 630 F.2d 1018, 1019 (4th Cir. 1980). This secular purpose must be the "pre-eminent" and "primary" force driving the government's action, and "has to be genuine, not a sham, and not merely secondary to a religious objective." *McCreary Cnty. v. ACLU*, 545 U.S. 844, 864 (2005). The test is violated where "the government action itself besp[eaks] the purpose," in that it is "patently religious." *Id.* at 862.

"[C]ontrolling caselaw suggests that an act so intrinsically religious as prayer cannot meet … the secular purpose prong[.]" *N.C. Civil Liberties Union v. Constangy*, 947 F.2d 1145, 1150 (4th Cir. 1991). *See Santa Fe*, 530 U.S. at 309; *Stone v. Graham*, 449 U.S. 39, 41 (1980) ("[t]he Ten Commandments are undeniably a sacred text in the Jewish and Christian faiths, and no legislative recitation of a supposed secular purpose can blind us to that fact.").

When, as here, "a state-sponsored activity has an overtly religious character, courts have consistently rejected efforts to assert a secular purpose for that activity." *Mellen*, 327 F.3d at 373. In *Mellen*, this Court held that prayers delivered at a military institute failed the purpose test because "the purpose of an official school prayer 'is plainly religious in nature.'" *Id.* at 374. In *Constangy*, the Court

held that a judge's opening prayers failed the test because of the "intrinsically religious" nature of prayer. 947 F.2d at 1150. Likewise, in *Hall*, the Court held a "motorist's prayer" failed the test because prayer "is undeniably religious and has, *by its nature*, both a religious purpose and effect." 630 F.2d at 1020 (emphasis added).

Because "prayer is 'a primary religious activity in itself,'" authorizing prayer at a school function "is *per se* an unconstitutional intent to further a religious goal." *Holloman v. Harland*, 370 F.3d 1252, 1285 (11th Cir. 2004).

Courts have consistently held that a school's decision to authorize graduation prayers reflects an unconstitutional religious purpose. *See Santa Fe*, 168 F.3d at 816-17; *Black Horse*, 84 F.3d at 1484-85; *Harris*, 41 F.3d at 458; *Gossage*, 2006 U.S. Dist. LEXIS 34613 at *19-20; *Skarin*, 204 F. Supp. 2d at 1198; *Appenheimer*, 2001 WL 1885834 at *10; *Gearon*, 844 F. Supp. at 1102; *Lundberg*, 731 F. Supp. at 342; *Graham*, 608 F. Supp. at 535; *Wimberley*, 704 A.2d at 1203; *Bennett*, 193 Cal. App. 3d at 1020. *See also Collins*, 644 F.2d at 762.

Here, as in the above cases, there is no secular purpose for the Prayer Policy. "[A]llowing the students to decide whether to include prayer does not cure the problem." *Appenheimer*, 2001 WL 1885834, at *10. The 2013 statement is merely an explicit decision to continue authorizing graduation prayer. Its purpose cannot "be characterized as 'secular' because its clear intent is to inform students … that

they can pray at any school event so long as a student 'initiates' the prayer[.]" *Ingebretsen v. Jackson Pub. Sch. Dist.*, 88 F.3d 274, 279 (5th Cir. 1996).

Indeed, in "light of the school's history of regular delivery of a student-led prayer" dating to 1951, it is "reasonable to infer that the specific purpose of the [new] policy [is] to preserve a popular 'state-sponsored religious practice'" thus failing *Lemon's* purpose prong. *Santa Fe*, 530 U.S. at 308-09, 315 (citing *Lee*, 505 U.S. at 596). *See Jager*, 862 F.2d at 830 ("In choosing the equal access plan, the School District opted for an alternative that permits religious invocations, which by definition serve religious purposes"); *Gossage*, 2006 U.S. Dist. LEXIS 34613, at *19-20 (new policy permitting uncensored student "remarks" was "nothing more than a poorly disguised attempt to ensure that prayer will continue").

## 2. The District failed to meet its burden of proving a secular purpose.

The "defendant [must] show by a preponderance of the evidence that action challenged" has a secular purpose. *Church of Scientology Flag Serv. v. Clearwater*, 2 F.3d 1514, 1530 (11th Cir. 1993).

The District has not offered any secular justification for its longstanding prayer practice or for its recent decision to continue to authorize graduation prayers. The "new position" is the District "simply reaching for any way to keep a religious [practice]." *McCreary*, 545 U.S. at 873. Even the court recognized that

the District "insists on securing every slight remaining loophole of religious demonstration in school[.]" (J.A.886).

The court's rationale (or lack thereof) is perhaps best explained by its belief that "[t]he Christian community, in certain parts, feels besieged." (J.A.885). According to the court, "[t]o certain parts of Western Christianity, the lack of prayer in the public sector is not only a symptom of declining religiosity and moralism but is, in part, the cause itself." *Id.* On the other hand, the court described Plaintiffs-Appellants as "chasing to the ends of the earth the last pitiful vestiges of these practices that have been essentially neutered of all possible eternal meaning and effect." (*Id.*886). It admonished Plaintiffs-Appellants that the "better strategy is arms laid down," in "submission" rather than "entitlement." (*Id.*).

The court's "purpose" analysis, confined to a single paragraph, is as conclusory as it is muddled. It focuses primarily on matters related to the effect prong: "The purpose of the current position is secular insofar as it governs a civil ceremony in graduation and protects the fullest liberties in speech for its participants. It is not any endorsement." (*Id.*896).

The very same "free speech" purpose was advanced in *Santa Fe* and rejected by the Court in concluding that a policy merely permitting student-initiated prayers failed the purpose test. 530 U.S. at 309. The Court observed, as is relevant here, "the fact that only one student is permitted to give a content-limited message

suggests that this policy does little to 'foster free expression.'" *Id.* The Third Circuit in *Black Horse* invalidated a facially neutral policy, which permitted student-initiated, un-censored graduation prayers, on similar grounds. 84 F.3d at 1484. In rejecting the purpose of "recognizing the students' rights to free speech," the court stressed that, "the constitutional guarantee of free speech does not secularize [the new policy's] attempt to preserve 'the long standing practice[.]'" *Id.*

Of course, "[t]hese new statements of purpose were presented only as a litigating position[.]" *McCreary*, 545 U.S. at 871. The court apparently read the "cases as if the purpose enquiry were so naive that any transparent claim to secularity would satisfy it, and [it] would cut context out of the enquiry, to the point of ignoring history[.]" *Id.* at 863-64.

Specifically, the court failed to take into account history and sequence of events, as well as the policy's *original* purpose, focusing exclusively on the litigation position. "But the world is not made brand new every morning[.]" *Id.* at 866. The District wants, and the court gave them, "an absentminded objective observer[.]" *Id.* "[P]urpose needs to be taken seriously" and "needs to be understood in light of context; an implausible claim that governmental purpose has changed should not carry the day[.]" *Id.* at 874.

The court was obligated to consider the "evolution of the current policy," which includes a history of "institutional practices that unquestionably violated the

Establishment Clause." *Santa Fe*, 530 U.S. at 309, 315. As in *Santa Fe*, "it makes sense to examine the [school's] latest action 'in light of [their] history of' unconstitutional practices." *McCreary*, 545 U.S. at 873. A proper examination reveals that the purpose of the 2013 statement is "to preserve a popular 'state-sponsored religious practice.'" 530 U.S. at 309 (citation omitted). Even the court understood it as an effort to secure "every slight remaining loophole of religious demonstration[.]" (J.A.886). The "context in which this policy arose," quells "any doubt that this policy was implemented with the purpose of endorsing school prayer." *Id.* at 315.

## C. <u>The Prayer Policy has the unconstitutional effect of advancing and endorsing religion.</u>

The "effect prong asks whether, irrespective of government's actual purpose, the practice under review in fact conveys a message of endorsement." *Constangy*, 947 F.2d at 1151. "[I]ntent is irrelevant." *Id.* Applying this test, the Supreme Court held that student-initiated prayer at a school-sponsored event unconstitutionally sends the "message to members of the audience who are nonadherants 'that they are outsiders[.]'" *Santa Fe*, 530 U.S. at 309-10 (citation omitted).

This Court has made clear that a prayer, "because it is religious, … advance[s] religion." *Hall*, 630 F.2d at 1021. Whenever a prayer "occurs at a school-sponsored event," the "conclusion is inescapable that the religious

26

invocation conveys a message that the school endorses" it. *Jager*, 862 F.2d at 831-32. "A religious service under governmental auspices necessarily conveys the message of approval or endorsement." *Doe v. Crestwood*, 917 F.2d 1476, 1478 (7th Cir. 1990).

Virtually every court to address the issue has held that graduation prayers unconstitutionally endorse religion, even if student-initiated. *See Cole*, 228 F.3d at 1103-04; *Santa Fe*, 168 F.3d at 817; *Black Horse*, 84 F.3d at 1486; *Harris*, 41 F.3d at 458; *Gossage*, 2006 U.S. Dist. LEXIS 34613, at *19-20; *Deveney*, 231 F. Supp. 2d at 487; *Skarin*, 204 F. Supp. 2d at 1198; *Appenheimer*, 2001 WL 1885834, at *6; *Gearon*, 844 F. Supp. at 1102; *Lundberg*, 731 F. Supp. at 345; *Graham*, 608 F. Supp. at 536; *Wimberly*, 704 A.2d at 1203; *Sands*, 53 Cal. 3d at 876.

As in the above cases, the District's prayers have "the primary effect of promoting religion," and send "the unequivocal message" of endorsement. *Mellen*, 327 F.3d at 372-74. In *Mellen*, this court held that prayers failed effect prong because, as here, they were delivered to "'a large audience assembled as part of a regularly scheduled, school-sponsored function.'" *Id.* (quoting *Santa Fe*, 530 U.S. at 307). Students are under the supervision and direction of school officials. (J.A.19¶¶49-51; 123¶¶49-51). Moreover, unlike the football games in *Santa Fe*, attendance is expected. "[G]raduation is one of life's most significant occasions." *Lee*, 505 U.S. at 595. In this context, "an objective observer" would inevitably

27

"perceive [the prayers] as a state endorsement of prayer." *Santa Fe*, 530 U.S. at 308.

Contrary to the District's "repeated assertions that it has adopted a 'hands-off' approach," the "realities of the situation plainly reveal that its policy involves both perceived and actual endorsement of religion." *Id.* at 305. It has "failed to divorce itself from the religious content in the invocations." *Id.* It "has not succeeded in doing so, either by claiming that its policy is 'one of neutrality rather than endorsement'" or "by characterizing the individual student as the 'circuit-breaker'" in "the process." *Id.* at 303.

In *Santa Fe*, despite the fact that any message would be student-led and student-initiated, and that it was possible no prayer would ever be delivered, the Court held that the effect of any prayer would result in "endorsement of religion." *Id.* at 305, 310.

The District's "plenary control over the graduation ceremony" makes "it apparent [that the prayer will bear] the imprint of the District." *Cole*, 228 F.3d at 1103. The Prayer Policy "permits a student to give a sectarian, proselytizing address." *Black Horse*, 84 F.3d at 1484-85. The "administration could not halt it without violating its own policy. If this were to occur, a proselytizing prayer (perhaps even degrading other religions) would be delivered in a forum controlled by the School [District]." *Id.* Putting "the ultimate choice to the students" does not

28

eliminate school-sponsorship. *Santa Fe*, 168 F.3d at 817. Prayers "that a school 'merely' permits will still be delivered to a government-organized audience" at "a government-sponsored event." *Id.*

The court's effect "analysis" was reduced to a single paragraph declaring: "there is no evidence that the position actually works a message of endorsement. … [L]iterally the only additional protection would be complete proscription of all religious comment, which is impermissible[.]" (J.A.897). Its conclusion hinged on three legally erroneous assumptions: (1) graduation ceremonies are public forums for private speech; (2) prohibiting graduation prayers violates Free Speech; and (3) graduation policies that "permit" prayer are permissible. As discussed below, these contentions are unfounded.

### 1. A graduation ceremony is not a forum for private speech and graduation prayers are "school sponsored."

Nearly every court that has ruled on the issue has concluded that graduation ceremonies are *not* public forums for private speech and that graduation prayers are "school sponsored" government speech. *See Lee*, 505 U.S. at 592; *Corder*, 566 F.3d at 1229-31; *Cole*, 228 F.3d at 1102 (student's "invocation would not have been private speech"); *Santa Fe*, 168 F.3d at 818-22 ("as a matter of law [the school] has not created a limited public forum"); *Black Horse*, 84 F.3d at 1477-78; *Harris*, 41 F.3d at 456-57; *Brody v. Spang*, 957 F.2d 1108, 1119-20, 1117 (3d Cir.

29

1992); *Workman*, 2010 U.S. Dist. LEXIS 42813, at \*22-23; *Ashby*, 354 F. Supp. 2d at 629; *Gossage*, 2006 U.S. Dist. LEXIS 34613, at \*10-11; *Deveney*, 231 F. Supp. 2d at 487-88; *Skarin*, 204 F. Supp. 2d at 1197; *Appenheimer*, 2001 WL 1885834, at \*6-9; *Gearon*, 844 F. Supp. at 1099-1000; *Lundberg*, 731 F. Supp. at 337.

"[S]chool facilities may be deemed to be public forums only if school authorities have … opened those facilities 'for indiscriminate use by the general public[.]'" *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 267 (1988) (citation omitted). In *Santa Fe*, the school made the same claim that the "messages are private student speech[.]" 530 U.S. at 302. The Court flatly rejected this contention, reasoning that the prayers take place "at government-sponsored school-related events." *Id.* The Court reiterated that "'selective access does not transform government property into a public forum.'" *Id.* at 303 (citation omitted).

In *Child Evangelism Fellowship v. Montgomery Cnty. Pub. Schs*, 373 F.3d 589, 598 n.5 (4th Cir. 2004), this Court ruled that the "prayer cases" including *Lee*, *Santa Fe*, and *Mellen*, "did not involve equal access; rather, government officials there granted an inherently religious activity (prayer) sole access to student audiences."[8] The fact that "graduation is not an open or public forum … disposes of this free speech argument." *Harris*, 41 F.3d at 458-59.

---

[8] *Cf. Turner*, 534 F.3d at 355-56 (there was not a "single case in which a legislative prayer was treated as individual or private speech.").

The court below relied on *Peck v. Upshur Cnty. Bd. of Educ.*, 155 F.3d 274, 275-82 (4th Cir. 1998), (J.A.893), which upheld an equal access policy allowing the display of materials by citizens "not affiliated in any way with the school." The Court emphasized that the materials were "outside of the formal classroom setting" and students could readily "ignore or simply walk past the table" without "calling any attention to that choice." *Id.* at 287-88.

In stark contrast, "[f]inding no violation under these circumstances would place objectors in the dilemma of participating, with all that implies, or protesting." *Lee*, 505 U.S. at 593. "The undeniable fact is that the school district's supervision and control of a high school graduation ceremony places public pressure, as well as peer pressure, on attending students to stand as a group or, at least, maintain respectful silence during the invocation and benediction." *Id.*

The court's reliance on *Child Evangelism Fellowship v. Anderson Sch. Dist. Five*, 470 F.3d 1062, 1068 (4th Cir. 2006) was equally misplaced. *See Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 115-16 (2001) ("where the school facilities are being used for a nonschool function … *Lee* is inapposite."). That case involved school property "not being used for school purposes." *Harris*, 41 F.3d at 456-57. The "essence of graduation is to place the school's imprimatur on the ceremony." *Lassonde*, 320 F.3d 985.

31

## 2. A policy prohibiting graduation prayer is required by the Establishment Clause, and does not in any way violate Free Speech.

The court below declared that "an affirmative exclusion of religious viewpoints is an equal violation. It is protected speech." (J.A.893). This is untenable, *supra*. "The delivery of such a message" by a "speaker representing the student body, under the supervision of school faculty," is "not properly characterized as 'private' speech." *Santa Fe*, 530 U.S. at 302-03, 310-15.

The government retains the right to "select the views that it wants to express," subject to the limits of the Establishment Clause. *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 468 (2009). In *Corder*, the Tenth Circuit recently upheld a school's decision to reprimand a student for delivering a religious graduation speech and expressly rejected the argument that her speech was protected. 566 F.3d at 1229. This was so even though she "spoke as one of fifteen valedictory speakers[.]" *Id.* The court reasoned, "the graduation ceremony was … clearly a school-sponsored event." *Id.*

Indeed, prohibiting graduation prayer is "'necessary' to avoid running afoul of the Establishment Clause." *Lassonde*, 320 F.3d at 984. In *Lassonde*, the Ninth Circuit concluded that if "the school had not censored the [religious] speech, the result would have been a violation of the Establishment Clause." *Id*.

In *Cole*, the Ninth Circuit similarly held that the Establishment Clause *required* prohibiting a religious graduation speech. 228 F.3d at 1103. This was so even though the court acknowledged that the "policy neither encourages a religious message nor subjects the speaker to a majority vote[.]" *Id*.[9]

In addition, many courts have enjoined schools from permitting graduation prayers. *E.g.*, *Lee*, 728 F. Supp. at 70-75, *aff'd*, 505 U.S. at 599; *Black Horse*, 84 F.3d at 1488; *Workman*, 2010 U.S. Dist. LEXIS 42813, at \*27; *Gossage*, 2006 U.S. Dist. LEXIS 34613, at \*19-20; *Deveney*, 231 F. Supp. 2d at 485-88; *Appenheimer*, 2001 WL 1885834; *Gearon*, 844 F. Supp. at 1102-03 ("forbidding the defendants from permitting prayer"); *Graham*, 608 F. Supp. at 537.

### 3. A policy "permitting" graduation prayers violates the Establishment Clause.

The Supreme Court and lower court "cases support no meaningful distinction between school authorities actually organizing the religious activity and officials merely 'permitting' students to direct the exercises." *Collins*, 644 F.2d at 760-62. *See Santa Fe*, 530 U.S. at 301 ("permitting student-led, student-initiated prayer at football games violates the Establishment Clause."). This makes sense because students "hear the prayers, not the policy." *Joyner v. Forsyth Cnty.*, 653

---

[9] *See also Ashby*, 354 F. Supp. 2d at 629-30 ("the decision not to allow the students to [deliver a religious song] was necessary to avoid violating the Establishment Clause"); *Lundberg*, 731 F. Supp. at 341 (upholding ban on graduation prayer).

F.3d 341, 354 (4th Cir. 2011). Students are still placed "in the dilemma of participating … or protesting." *Lee*, 505 U.S. at 593. For this reason, the Court in *Santa Fe* held the policy would be unconstitutional even if "facially neutral." 530 U.S. at 307 n.21.

Numerous courts have held that practices that simply permit graduation prayers are unconstitutional. *See Santa Fe*, 168 F.3d at 816; *Lassonde*, 320 F.3d at 983; *Cole*, 228 F.3d at 1104 (merely "**allowing** the students to engage in sectarian prayer" would "amount to government sponsorship"); *Black Horse*, 84 F.3d at 1484; *Harris*, 41 F.3d at 452-54 ("merely '**permitting'** students to direct the exercises'") (citation omitted); *Workman*, 2010 U.S. Dist. LEXIS 42813 at *27 ("**permitting** a student-led prayer at [the graduation] represents a clear violation"); *Gossage*, 2006 U.S. Dist. LEXIS 34613, at *19-20 (simply "**allowing** [student] prayer"); *Ashby*, 354 F. Supp. 2d at 629-30; *Deveney*, 231 F. Supp. 2d at 485-88; *Skarin*, 204 F. Supp. 2d at 1198; *Appenheimer*, 2001 WL 1885834, at *6-9 ("**allowing** student-led prayer violates the First Amendment"); *Gearon*, 844 F. Supp. at 1098-1103 ("**permitting** prayer" is "a violation" even if "student-initiated"); *Lundberg*, 731 F. Supp. at 345-46; *Graham*, 608 F. Supp. at 537; *Sands*, 53 Cal. 3d at 878-79; *Bennett*, 193 Cal. App. 3d at 1020. (Emphasis added in each).

In *Santa Fe*, the school argued that the graduation policy was constitutional because it "does not require prayer." 168 F.3d at 818 n.10. The court rejected this argument, declaring: "Prayers that a school 'merely' permits will still be delivered to a government-organized audience." *Id.* at 817-18. The court added that even if prayers were "spontaneously initiated[,]" officials "are present and have the authority to stop the prayers." *Id*.

In *Black Horse*, the school's policy of permitting, but not requiring, student-initiated prayer even required the "printed programs … include a disclaimer." 84 F.3d at 1475. Nevertheless, the Third Circuit held the policy unconstitutional because it *permitted* prayer; it was not inclined to "alter [its] analysis merely because [the policy] does not expressly allow proselytization." *Id.* at 1479. It found "the reasoning of [*Harris*]" to be particularly "persuasive." *Id.* at 1483.

In *Harris*, the Ninth Circuit held a facially neutral policy unconstitutional even though any prayer would have to be initiated, selected, and delivered by students, explaining: "When the senior class is given plenary power over a state-sponsored, state-controlled event such as high school graduation, it is just as constrained by the Constitution as the state would be." 41 F.3d at 455.

In *Collins*, the Ninth Circuit similarly held that "merely 'permitting' students" to open assemblies with prayer unconstitutionally endorsed religion, even though the assemblies were organized and conducted by students. 644 F.2d at

35

760-62. The court also rejected the argument that the "denial of permission …
would violate the students' rights to free speech." *Id.* at 792.

In *Gearon*, the school argued that the "remarks delivered were student-
initiated, student-written and student-delivered," and therefore constitutional. 844
F. Supp. at 1098-99. The court disagreed, noting that "[s]tate sponsorship, *i.e.*,
involvement in, a graduation ceremony is inherent." *Id.*

Similarly, in *Gossage*, a school had a history of regularly including student
prayers in graduation ceremonies. 2006 U.S. Dist. LEXIS 34613, *2-3. After a
student filed suit, the school changed its policy. *Id.* Under the new policy, a student
could give an uncensored "opening and/or closing message." *Id.* "Despite the
hands-off approach as to the content of the remarks," the court properly concluded
that the policy was still "unconstitutional in light of *Santa Fe*" because "school
officials still maintain certain control over the ceremony." *Id.* at *10-14*, *19-20*.

### 4.  The "New Position" is facially unconstitutional.

The district court concluded that the "new position … is both neutral and
passive. On its face, it does not invite any prayer or speech, sectarian or otherwise;
it cannot be said to be coercive." (J.A.891). This is mistaken. The "new position"
expressly approves "a student delivering a **prayer** or providing **a religious**
**message** during a **school sponsored event**[.]" (J.A.884; 888) (emphasis added). As
in *Santa Fe*, this position, "by its terms, invites and encourages religious

36

messages." 530 U.S. at 306. *Cf. Adler v. Duval Cnty. Sch. Bd.*, 250 F.3d 1330, 1342 (11th Cir. 2001) (upholding policy on its face because of "the complete absence … of code words such as 'invocation' unequivocally connoting religion.").

### 5. The Prayer Policy is unconstitutional as applied and cannot be meaningfully distinguished from *Santa Fe*.

The court strained to distinguish *Santa Fe*. It relied almost entirely on the fact that the policy involved "election processes[.]" (J.A.892). The court also summarily rejected persuasive sister circuit cases; it only mentioned *Black Horse* in passing, stating: "The defendant's new position involves no selection process, or election[.]" (*Id.*889). But the "new position" does involve "selection processes," and the facts here are even more problematic than in *Santa Fe*, *infra*.

Whereas in *Santa Fe* there was a "dual election," an effort to distance the school from the prayers, in many of the schools here, the speakers are selected *directly* by school officials, making the state's imprimatur even greater. 530 U.S. at 306 (finding the two-step process problematic *because* it involved "the school in the selection of the speaker").

Many of the schools choose the speakers based on their ability to publicly speak or on "citizenship criteria," giving teachers wide discretion to pick students whom they know will pray. (J.A.79-80; 319; 816; 847; 850-52; 883; 894). At many

other schools, the speakers are selected based on class office. (*Id.*). To this extent, the selection process suffers from the very concerns in *Santa Fe*; a "majority election." *Id.* The "new position" does not change these "selection processes." (*Id.*).

Regardless, the "election process" in *Santa Fe* was only one, and hardly a dispositive, factor. The Court emphasized that the "endorsement of the message" is "established by factors beyond just the *text of the policy.*" *Id.* at 307-08 (emphasis added). It was far more relevant that the prayer would be "delivered to a large audience assembled as part of a regularly scheduled, school-sponsored function." *Id.* To this end, the Court made clear that *even if* the "plain language … were facially neutral, 'the Establishment Clause forbids a State to hide behind the application of formally neutral criteria and remain studiously oblivious to the effects of its actions.'" *Id.* at n.21 (citation omitted). Looking to such "effects," the Court held that "a pregame prayer has the improper effect of coercing those present to participate." *Id.* at 312.

The court flouted this portion of *Santa Fe*, stating: "This comment simply reiterates a legal point inapplicable here." (J.A.892 n.4). But the cases cited by *Santa Fe* prove otherwise. The passage of *Capitol Square Review v. Pinette*, 515 U.S. 753, 777 (1995) (O'Connor, J., concurring) states: "[w]here the government's operation of a public forum has the effect of endorsing religion,… the

Establishment Clause is violated." This is so "because the State's own actions (operating the forum in a particular manner *and permitting the religious expression* to take place therein), and their relationship to the private speech at issue, actually convey a message of endorsement." *Id.* (emphasis added).[10]

In *Mellen*, this Court did not read *Santa Fe* as placing significant weight on the policy's text or its election process. It explained, "[i]n *Santa F*e, the Court considered two primary issues. First, it assessed whether the invocation should be considered public, rather than private, speech." 327 F.3d at 367. The "second" was "whether the pregame prayer was unduly coercive." *Id.* at 367-68. As in *Mellen* and *Santa Fe*, the prayers are delivered at a "school-sponsored function" and are thus stamped with the "school's seal of approval." 530 U.S. at 307-08.

And, independent of any written policy or election, "[t]he new [position] does nothing to eliminate the fact that a minority of students are impermissibly coerced to participate in a religious exercise." *Gossage*, 2006 U.S. Dist. LEXIS 34613, at *19-20. Even with the more attenuated policy in *Santa Fe*, the Court decisively held that the "'circuit-breaker' mechanism" did not "insulate the school from the coercive element of the final message." 530 U.S. at 310. *See also Black Horse*, 84 F.3d at 1487. As the Ninth Circuit held in *Lassonde*, "[e]ven if the school district could have conducted the proceedings so as to avoid" endorsement,

---

[10] *See also Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 534-35 (1993) ("Facial neutrality is not determinative.").

it "ha[s] no means of preventing the coerced participation … other than censoring [religious] speech." 320 F.3d at 984.

Indeed, the Prayer Policy here is more egregiously unconstitutional those struck down in *Santa Fe*, *Lee*, and their progeny.

First, the Prayer Policy authorizes prayer at elementary and middle school graduations. There are "heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools." *Lee*, 505 U.S. at 592. "In elementary schools, the concerns animating the coercion principle are at their strongest because of the impressionability of young elementary-age children." *Peck*, 155 F.3d at 288 n* (equal access policy unconstitutional "in the elementary schools" but not high schools). Plaintiffs-Appellants are not aware of a single case upholding graduation prayers in elementary schools.

Second, as noted, unlike the student-election in *Santa Fe*, school officials select the speakers, even under the "new position," *supra*. Third, the prayers are almost always Christian. *See Lee*, 505 U.S. at 589; *Cole*, 228 F.3d at 1104. Finally, at MVES, the prayers are delivered in a religious setting, thus compounding the school's endorsement of Christianity.

### 6. The court misapplied *Joyner*.

The court properly understood *Joyner* as instructive in assessing a facially neutral policy but completely missed the mark in applying it. (*Joyner* is an otherwise inapposite legislative prayer case.) (J.A.890).

In *Joyner*, a county had a facially neutral policy stating that legislative prayers, delivered by private citizens, "shall not be implemented or construed in any way, to affiliate the Board with, nor express the Board's preference for, any faith or religious denomination." 653 F.3d at 344. This Court agreed the "policy is neutral." *Id.* at 353. "But the policy, as implemented," the Court opined, "is an altogether different matter." *Id.* It was not enough to contend "that the policy was 'neutral and proactively inclusive,'" when the "County was not in any way proactive in discouraging sectarian prayer[.]" *Id.*

The court attempted to distinguish *Joyner*, first on the basis that the county "remained active," in that it was "active to invite area clergy" and "the Board meeting allotted specific time at the beginning for such prayers[.]" (J.A.891). But the District has "remained active," far more so than in *Joyner*, by inviting school-selected students to deliver "prayer" or "religious messages." (*Id.*888). The District also "allots" a "specific time" in the program for such messages. *Id.*

The court next attempted to distinguish *Joyner* on the ground that the prayers were "Christian in quality." (J.A.891). This is irrelevant because even

41

nonsectarian *graduation* prayers are unconstitutional. *Lee*, 505 U.S. at 594. Regardless, the graduation prayers are "Christian in quality," even since the "new position." The court's only response is to cast these as "*de minimis* incidents of religious messaging in 2014[.]" (J.A.896-97). But the coercive effect of the prayers cannot be "refuted by arguing that these prayers, and similar ones to be said in the future, are of *a de minimis* character." *Id*.

Finally, the court surmised, without further explanation, that "[b]oth, of *Joyner* and *Santa Fe*, involve a kind of 'permission' and 'authorization' not present at all in this case." (J.A.893). By not prohibiting prayers, the school is *permitting* them. In fact, the statement expressly *authorizes* "prayer." This involves far more "permission" than *Joyner*, where the county allowed "all religious leaders" to deliver invocations on a "first-come, first-serve basis," "exercised no editorial control," and "stated affirmatively … that the prayer opportunity must not be 'exploited.'" 653 F.3d at 362-63 (Niemeyer, J., dissenting).

### D. *Adler* is unpersuasive and distinguishable.

The court rested its decision almost entirely on the Eleventh Circuit's decision in *Adler*, an outlier that contravenes *Santa Fe* and practically every other graduation prayer case. At the same time, it ignored applicable Fourth Circuit cases; it never once mentioned *Mellen*, *Hall*, or *Constangy*, which each held

government-sponsored prayers unconstitutional. Beyond this, *Adler* is wholly inapposite and unpersuasive.

First and most importantly, *Adler* involved a facial challenge only; the Eleventh Circuit "***expressly*** declined to consider … any as-applied objection to the policy's constitutionality." 250 F.3d at 1332 n.1 (emphasis added). To this extent, *Adler* conflicts with this Court's rulings, and *Santa Fe*, which hold that even if a policy is facially neutral, "[the court] cannot turn a blind eye to the practical effects of the invocations." *Joyner*, 653 F.3d at 348; 354.

Second, *Adler* contravenes *Santa Fe*. The policy provided that "[t]he opening and/or closing message shall be given by a student volunteer, in the graduating senior class, chosen by the graduating senior class as a whole." 250 F.3d at 1332. *See Santa Fe*, 530 U.S. at 316 ("This policy likewise does not survive a facial challenge because it impermissibly imposes upon the student body a majoritarian election on the issue of prayer").

Four *Adler* justices in a strong dissent properly maintained that the policy was unconstitutional pursuant to *Santa Fe*. *See* 250 F.3d at 1344-45 (Kravitch, J., Anderson, C.J., Carnes, and Barkett, J.J, dissenting) ("By considering only the terms of the policy itself, the majority fails to address contextual evidence that evinces an impermissible religious purpose."); *id.* at 1347-48 (Carnes) ("[I]n light of the additional guidance the *Santa Fe* decision has given us, … a school board

43

may not delegate to the student body or some subgroup of it the power to do by majority vote what the school board itself may not do.").

Consequently, courts confronted with identical facts have disregarded *Adler*. For instance, in *Gossage*, a school adopted a facially neutral policy specifically to fit "within the confines of [*Adler*]." 2006 U.S. Dist. LEXIS 34613, at *2-5, *11. Nevertheless, the court found *Adler* unpersuasive, concluding that the *Adler* policy was "unconstitutional in light of *Santa Fe*." *Id.* at *10-11, *13-14.

In addition, *Adler* is factually distinguishable. The court relied on "'the total absence of state involvement in deciding whether there will be a graduation message, who will speak, or what the speaker may say.'" 250 F.3d at 1342.

First, unlike in *Adler*, the speakers are selected by the school. *See Corder*, 566 F.3d at 1229 n.5 ("*Adler* is distinguishable" because the speaker "was chosen by the school" based on her "4.0 [GPA]."); *Workman*, 2010 U.S. Dist. LEXIS 42813 at *23-24 (distinguishing *Adler* because speakers selected on class rank).

Second, as in *Santa Fe*, the "new position" is not facially neutral; it expressly authorizes "prayer." (J.A.888). In *Holloman*, the Eleventh Circuit clarified that in *Adler* "we upheld a school's policy … because of 'the complete absence … of code words such as 'invocation.'" 370 F.3d at 1289.

Third, and critically, the District *will censor* prayers and messages that "*create a disturbance*." (J.A.888). *Adler* involved no censorship whatsoever. 250 F.3d at 1332-37.

Fourth, the District authorizes graduation prayers for impressionable elementary students. *See Peck*, 155 F.3d at 287 n*.

For the foregoing reasons, the court erred in relying on *Adler*. But it did not stop there. It placed substantial weight yet another Eleventh Circuit case, *Chandler v. James*, 180 F.3d 1254 (11th Cir. 1999), *vacated*, 530 U.S. 1256, *reinstated*, 230 F.3d 1313 (11th Cir. 2000), which did not directly involve graduation prayers.

Quoting *Chandler*, the court below declared: "'Because genuinely student-initiated religious speech is private speech endorsing religion, it is fully protected[.]'" (J.A.897-98). This of course, rests on the entirely mistaken premise that school-sponsored graduations are public forums. Again, this "ignores the clear holding of *Santa Fe* to the contrary[.]" *Workman*, 2010 U.S. Dist. LEXIS 42813, *21. *See Santa Fe*, 530 U.S. at 302-03.

Furthermore, the Supreme Court has "never held [that] the mere creation of a public forum shields the government entity from scrutiny under the Establishment Clause." *Id.* at 303 n.13. *See also Cole*, 228 F.3d at 1101 (even assuming the ceremony was a "public forum, the District's refusal to allow the students to deliver a sectarian speech or prayer" was "necessary"). "[T]he dangers

of entangling religious speech into a convocation where the audience [i]s essentially captive" outweighs any claimed "interest in presenting proselytistic speech." *Nurre*, 580 F.3d at 1094 n.5.

*Chandler* is also distinguishable. An injunction was held overbroad because "it equated all student religious speech *in any public context* at school with State speech." 230 F.3d at 1316 (emphasis added). Plaintiffs-Appellants seek only to enjoin prayer as part of formal school-sponsored graduation ceremonies. *See Holloman*, 370 F.3d at 1287.

### E.  The ratio of 2014 prayers is immaterial but not "*de minimis*."

Relying on *Adler*, the court contended that "plaintiffs now have a serious kind of evidentiary problem." (J.A.889). According to the court, the "new position" wiped the slate clean. But, much to the contrary, the 2013 "position" simply codified the longstanding unconstitutional practice by expressly authorizing "prayer." The record of Christian prayers delivered at 2014 elementary and high school ceremonies proves as much, *supra*. The District does not claim these 2014 prayers were in contravention of its 2013 statement.[11]

The court's only response was to chalk these up as "*de minimis* incidents of religious messaging in 2014[.]" (J.A.896). Relying exclusively on *Adler I*, which

---

[11] Puzzlingly, the court contended "these occurrences are incident to the prior policy[.]" (J.A.895).

46

was vacated by *Adler II*, the court averred that these "incidents, however, are not representative of the kind of ratio that suggests unconstitutionality in practice." (*Id.* *23-24).

However, in *Santa Fe*, the Court held the policy unconstitutional even though it *had yet to be implemented*; unlike here, there was *no evidence whatsoever* that prayers would be delivered. 530 U.S. at 315. The school argued that "until a student actually delivers a solemnizing message … there can be no certainty that any of the statements … will be religious." *Id.* at 313. The Court agreed with this premise but held: "We need not wait for the inevitable to confirm and magnify the constitutional injury." *Id.* at 313-16. Indeed, the Court declared that even if no "student were ever to offer a religious message, the [new] policy fails." *Id.*

Plaintiffs-Appellants are not aware of any other graduation prayer case that turned on "ratio" evidence. Furthermore, *Adler I* looked to the ratio *because* it was evaluating a facial challenge only. 206 F.3d at 1083-84. The court explained: "A facial challenge to be successful 'must establish that no set of circumstances exists under which the Act would be valid.'" *Id.* (citation omitted). The ratio was directly relevant to the "set of circumstances" analysis. *Id.*

Nor are the 2014 prayers "*de minimis*." In *Lee*, the Court rejected this very argument, holding that the "embarrassment and the intrusion of the religious

47

exercise cannot be refuted by arguing that these prayers, and similar ones to be said in the future, are of a *de minimis* character." 505 U.S. at 594.

### F. **The Prayer Policy fosters excessive entanglement with religion.**

The District's oversight, sponsorship, and control over the graduation ceremony, and its ultimate responsibility for the prayers, foster excessive entanglement with religion. *See Collins*, 644 F.2d at 762; *Deveney*, 231 F. Supp. 2d at 487; *Gearon*, 844 F. Supp. at 1102; *Skarin*, 204 F. Supp. 2d at 1198; *Sands*, 53 Cal. 3d at 879. This Court has repeatedly held that state endorsement of prayer "necessarily" results in unconstitutional entanglement. *Mellen*, 327 F.3d at 375; *Constangy*, 947 F.2d at 1151-52; *Hall*, 630 F.2d at 1021.

In upholding the Prayer Policy under this prong, the court relied almost entirely on *Doe v. Sch. Dist. of Norfolk*, 340 F.3d 605 (8th Cir. 2003), citing it for the notion that the 2013 "position requires and expects no involvement of the schools[.]" (J.A.897). This is incorrect.

The "new position" by its terms, expects censorship and entanglement: the District will censor prayers that "create a disturbance." (J.A.888). "[A]ny such determination would necessarily entangle the administration in deciding religious issues." *Bell v. Little Axe Indep. Sch. Dist.*, 766 F.2d 1391, 1406 (10th Cir. 1985). *See also Gearon*, 844 F. Supp. at 1100 n.5; *Bennett*, 193 Cal. App. 3d at 1020. Undoubtedly, a student conveying an unpopular religious position, such as

48

rejecting the divinity of Christ or any deity, would create a "disturbance." Thus, the practice not only entangles the school with religion but also has the unconstitutional effect of silencing minority religious views.

Furthermore, *Norfolk* is emphatically inapposite. The issue was whether a district could be liable for the actions of a rogue board member who "was acting in circumvention of the School District's policy" that "no prayers would be held." 340 F.3d at 612-15. The court concluded that it could not be liable because it "specifically advised all graduation participants, including the school-board-member parent, that prayer was not permitted[.]" *Wigg v. Sioux Falls Sch. Dist.*, 382 F.3d 807, 814-15 (8th Cir. 2004).

## III.  THE PRAYER POLICY FAILS THE COERCION TEST.

Among the court's more glaring errors was its failure to even apply the coercion test. In "*Lee*, the Court formulated its 'coercion test.'" *Mellen*, 327 F.3d at 370. The Court held that a nonsectarian gradation prayer was unconstitutionally coercive even though the event was technically voluntary. *Lee*, 505 U.S. at 586. The Court reasoned that a school's "supervision and control of a … graduation ceremony places public pressure, as well as peer pressure" on students. *Id.* at 593. Students opposed to the prayer are placed "in the dilemma of participating … or protesting." *Id.* The Court concluded that a school may not "place primary and secondary school children in this position." *Id.*

Notably, in *Santa Fe*, the Court held that even student-initiated, student-led prayers at football games failed the coercion test. 530 U.S. at 310. The school argued that the policy was "distinguishable from … *Lee* because it does not coerce students." *Id*. The Court rejected this contention, observing that even "if we regard every high school student's decision to attend a home football game as purely voluntary, we are nevertheless persuaded that the delivery of a pregame prayer has the improper effect of coercing those present." *Id*. at 311-12.

Since *Lee*, many courts have properly held that student-led and student-initiated graduation prayers fail the coercion test. *See Lassonde*, 320 F.3d at 983; *Cole*, 228 F.3d at 1104; *Santa Fe*, 168 F.3d at 818; *Black Horse*, 84 F.3d at 1480; *Harris*, 41 F.3d at 457; *Workman*, 2010 U.S. Dist. LEXIS 42813, at *16-17; *Gossage*, 2006 U.S. Dist. LEXIS 34613 at *20-21; *Gearon*, 844 F. Supp. at 1099.

This Court has emphasized "[i]n the context of school prayer," the court "must give special consideration, under the principles discussed in *Lee* and *Santa Fe*, to whether a state has coerced religious worship." *Mellen*, 327 F.3d at 371-72 (prayers delivered to *adults* failed coercion test). The district court eschewed the coercion test entirely. It merely stated that the 2013 position "cannot be said to be coercive." (J.A891). But, in a Janus-like fashion, the court readily agreed that "pressure to stand participatorily at a graduation in prayer or other religious rite is inherently violative." (J.A.894 n.6).

50

Had the court properly applied the test, it would have to conclude that "the effect of the particular prayer that is offered in any given year will be to advance religion and coerce dissenting students." *Black Horse*, 84 F.3d at 1487.

That the prayers are "student-initiated" is irrelevant. *Santa Fe*, 530 U.S. at 301-02. The Court in *Santa Fe* held that the "dual elections and student speaker" did not "insulate the school from the coercive element of the final message." *Id.* at 310. Similarly, the "new position" does "nothing to eliminate the fact that a minority of students are impermissibly coerced to participate in a religious exercise." *Gossage*, 2006 U.S. Dist. LEXIS 34613 at *20.

The District "cannot sanction coerced participation in a religious observance merely by disclaiming responsibility for the content of the ceremony." *Black Horse*, 84 F.3d at 1482. In *Lassonde*, the court observed that "[e]ven if a disclaimer were given, and even if it could dissolve governmental 'entanglement,'" "permitting a proselytizing speech at a public school's graduation ceremony would amount to coerced participation in a religious practice." 320 F.3d at 984-85.

## IV.  THE COURT ERRED IN DISMISSING PLAINTIFFS-APPELLANTS' CHAPEL POLICY CLAIMS.

### A. <u>Plaintiffs-Appellants' nominal damage claim is not moot.</u>

The court granted Defendant-Appellee's Cross-Motion in its entirety on the Chapel Policy claims, including Plaintiffs-Appellants' claim for nominal damages. (J.A.881). The court dismissed the Chapel Policy claims as moot. (J.A.880).

51

However, even "if a plaintiff's injunctive relief claim has been mooted, the action is not moot if the plaintiff may be 'entitled to at least nominal damages.'" *Rendelman v. Rouse*, 569 F.3d 182, 187 (4th Cir. 2009) (citation omitted); *see Cole*, 228 F.3d at 1099-1100 ("Although a student's graduation moots his claims for declaratory and injunctive relief … we must address the damage claims"). (J.A.900). Moreover, once it is shown that a constitutional violation occurred, a court has *no discretion* to deny nominal damages. *Farrar v. Hobby*, 506 U.S. 103, 112 (1992); *Covenant Media of S.C., LLC v. N. Charleston*, 493 F.3d 421, 429 n.4 (4th Cir. 2007).

It was therefore incumbent upon the court to determine whether the Chapel Policy violated Plaintiffs-Appellants' constitutional rights and upon such determination, award nominal damages; its failure to do so was an error. *See Dawkins v. Huffman*, 25 Fed. App'x 107 (4th Cir. 2001); *Jackson v. Hill*, 569 Fed. App'x 697, 699 (11th Cir. 2014) ("The district court erroneously failed to consider whether Jackson was entitled to nominal damages"); *Sahagian v. Dickey*, 827 F.2d 90, 100 (7th Cir. 1987) (court erred because it "did not consider an award of nominal damages.").

## B. The Does have municipal taxpayer standing.

The court also erred in holding Plaintiffs-Appellants' prospective relief claims moot. Jane Doe is a municipal taxpayer who objects to the expenditure of

municipal funds on Turner Chapel graduations, which is sufficient for "municipal taxpayer has standing." *Koenick v. Felton*, 190 F.3d 259, 263 (4th Cir. 1999).

The district court and Seventh Circuit concluded that several plaintiffs had municipal taxpayer standing to challenge a similar chapel policy in *Does 1 v. Elmbrook Joint Common Sch. Dist.*, 2010 U.S. Dist. LEXIS 72354, *18 (E.D. Wis. 2010), *standing affirmed*, *Doe v. Elmbrook Sch. Dist.*, 687 F.3d 840, 851 (7th Cir. 2012) (en banc), *cert. denied*, 134 S. Ct. 2283 (2014).

At least $229 of municipal funds were expended on the 2012 Turner Chapel ceremony. (J.A.879). The cost for bus transportation was $146.20 in 2013 and $146.33 in 2014. In 2013, it also paid a $40 facility fee. (J.A.873-74). In addition, municipal funds in the form of personnel time and materials (such as printing invitations and flyers) were expended on the 2012, 2013, 2014, and 2015 ceremonies. (J.A.92-97; 238; 567-577).

The foregoing is more than sufficient for municipal taxpayer standing. *See Pelphrey v. Cobb Cnty.*, 547 F.3d 1263, 1267, 1280-81 (11th Cir. 2008) ("the County expend[ed] municipal funds, in the form of materials and personnel time"); *Newman v. East Point*, 181 F. Supp. 2d 1374, 1377-78 (N.D. Ga. 2002) (taxpayer funds "were used to print the flyers"); *Harvey v. Cobb Cnty.*, 811 F. Supp. 669, 675-76 (N.D. Ga. 1993) ("[t]hese actions by a supervisor and by Cobb County inmates, who were housed, fed, and transported by Cobb County at Cobb County's

expense, constitute the use of tax revenues, however small and indirect, on the panel.").

Nevertheless, the court accepted the District's superficial argument that "the monies came from MVES's school based account that is derived from non-tax revenue sources[.]" (J.A.879). The court relied solely on Robin Tate's affidavit, which alleged that funds for "2013 and 2014 awards programs," comprised "of proceeds and interest received from the school's afterschool program, Coke machine(s) sales, and donations made to the school to be used for any general need." (J.A.873-74; 879).

As a preliminary matter, the affidavit does not address the 2012 ceremony, Tigerville Elementary concerts, or personnel time and materials; it only addressed 2013 and 2014 bus transportation and facility fees. (*Id.*).

That there is a "separate account" is irrelevant. It need only be shown that the activity was "supported by any separate tax or paid for from any *particular appropriation* or that it adds *any sum whatever* to the cost of conducting the school." *Doremus v. Bd. of Educ. of Hawthorne*, 342 U.S. 429, 433 (1952) (emphasis added). It suffices that there is a "loss of revenue to the [municipal's] general fund." *Hawley v. Cleveland*, 773 F.2d 736, 741 (6th Cir. 1985) (municipal taxpayers may challenge lease to church where it could have detrimental impact on the public fisc).

Stated differently, "the varied sources that combine to fund municipal treasuries … do not affect the viability of [taxpayer standing]. From the perspective of a municipal taxpayer, funding unconstitutional conduct may be cheap because other sources subsidize the expenditures." *Smith v. Jefferson Cnty. Bd. of Sch. Comm'rs*, 641 F.3d 197, 220-21 (6th Cir. 2011) (Boyce, J., concurring in full).

## V.   THE CHAPEL POLICY IS UNCONSTITUTIONAL.

Holding a public school graduation ceremony "in a religious institution … [is] contrary to Supreme Court precedent." *Musgrove v. Sch. Bd.*, 608 F. Supp. 2d 1303, 1305 (M.D. Fla. 2005). The jurisprudence analyzing similar graduation chapel practices is decidedly against Defendant-Appellee. *See Elmbrook*, 687 F.3d at 851; *Does v. Enfield Pub. Sch.*, 716 F. Supp. 2d 172 (D. Conn. 2010); *Spacco v. Bridgewater Sch. Dep't*, 722 F. Supp. 834, 842 (D. Mass. 1989); *Reimann v. Fremont County Joint Sch. Dist*, Civil No. 80-4059, 1980 WL 590189 (D. Idaho 1980); *Lemke v. Black*, 376 F. Supp. 87, 89-90 (E.D. Wis. 1974).

### A.   <u>The Chapel Policy has the effect of endorsing religion.</u>

"Regardless of the purposes motivating it," *infra*, the Chapel Policy "fails *Lemon's* second prong," *Mellen*, 327 F.3d at 374, because the "sheer religiosity of the space" creates "a likelihood" that students "perceive a link between church and state." *Elmbrook*, 687 F.3d at 853. Under the effect prong, "[t]he *mere appearance*

55

of a joint exercise" between "Church and State" is unconstitutional. *Larkin v. Grendel's Den*, 459 U.S. 116, 125-26 (1982) (emphasis added). *See Smith v. Cnty. of Albemarle*, 895 F.2d 953, 959 (4th Cir. 1990) (crèche unconstitutional because it had "the appearance … of *endorsing* religion").

In a case directly on point, the Seventh Circuit in *Elmbrook* ruled that holding high school graduations in a church failed the effect prong. 687 F.3d at 856. Notably, the venue was not a "traditional church sanctuary." *Id.* at 844 n.1. The room was "the 'auditorium'" and used only for weekend services. *Id*. In contrast, Turner Chapel is the site of "regular chapel services" has "eight stained glass windows" and a pipe organ. (J.A.16¶16; 120¶16).

The court in *Enfield* similarly ruled that holding high school graduations in a church "constitutes an impermissible endorsement of religion because it conveys the message that certain religious views are embraced by Enfield Schools, and others are not." 716 F. Supp. 2d at 189.

In *Spacco*, the court held that students assigned to a public school facility leased from the Roman Catholic Church were entitled to an injunction because of the religious character of the space. 722 F. Supp. at 842-43. The court observed, as is relevant here, that, "in order to enter the building, the children and other individuals pass beneath a large cross[."] *Id.* The court concluded that the Establishment Clause was violated, even though by "[s]imply sitting in a

classroom, a reasonable observer … would not receive any constitutionally impermissible message from his or her surroundings." *Id*. Turner Chapel "creates an environment even more overwrought with religious symbols than the venue challenged in *Spacco*." *Enfield*, 716 F. Supp. 2d at 191.

The "presence of religious iconography" in and around Turner Chapel, "is likely to prove particularly powerful, indicating to everyone that the religious message is favored and to nonadherents that they are outsiders." *Elmbrook*, 687 F.3d at 853. Even the magistrate conceded: "In this case, religious imagery was easily visible and the overall environment was clearly Christian[.]" (J.A.807).

Turner Chapel is not only a *Christian place of worship*, but it is located in the center of a pervasively Christian campus, *supra.* The chapel is a place where "evangelism" is a focus. (J.A.16¶17; 121¶17). A prominent Christian cross sits on top of the chapel and on nearby buildings. To enter the chapel, students must pass beneath a cross. NGU's logo depicting the cross and its slogan, "Christ Makes the Difference," appears prominently throughout campus, including at the entranceways to the chapel, and to the campus. (J.A.257-261; 613-730).

Surrounding the entire interior of the sanctuary are eight large stained glass windows of Christian religious scenes, each featuring Jesus. (*Id.*). Proselytizing Christian monuments of Jesus and Biblical scripture surround the chapel. (*Id.*). *See Washegesic v. Bloomingdale Pub. Sch.*, 33 F.3d 679, 684 (6th Cir. 1994) ("Christ

is central only to Christianity, and his portrait has a proselytizing, affirming effect that some non-believers find deeply offensive.").

Three additional facts make the religious endorsement even stronger in this case than in *Elmbrook* and *Enfield*: (1) prayers are authorized; (2) the students are in elementary school (*e.g.*, *Peck*, *supra*); and (3) the church is located within a pervasively Christian university, compounding the perception of Christian favoritism. *See Smith*, 895 F.2d at 958 ("The endorsement of the religious message proceeds as much from the religious display itself as from the identification of a religious sponsor.").

In short, "[b]y choosing to hold graduations at [the chapel]," the District "sends the message that it is closely linked" with Turner Chapel *and* NGU "and its religious mission, that it favors the religious over the irreligious, and that it prefers Christians." *Enfield*, 716 F. Supp. 2d at 192.

### B. The Chapel policy lacks a secular purpose.

An unconstitutional religious purpose may be inferred here because Turner Chapel is "patently religious." *McCreary*, 545 U.S. at 862-63.

Furthermore, "[t]he government "cannot escape the proscriptions of the Establishment Clause merely by identifying a beneficial secular purpose." *Hall*, 630 F.2d at 1020-21. "The unmistakable message of the Supreme Court's

58

teachings is that the state cannot employ a religious means to serve otherwise legitimate secular interest[.]" *Treen*, 653 F.2d at 901.

In *Hall*, for instance, the state contended that a prayer printed on the state map "promoted safety, which is a legitimate secular purpose." 630 F.2d at 1020-21. The Court held that the prayer failed the purpose prong because the state chose "a clearly religious means to promote its secular end." *Id.*

The Eleventh Circuit (the district court's preferred jurisdiction) has also ruled: "attempting to further an ostensibly secular purpose through avowedly religious means is considered to have a constitutionally impermissible purpose." *Holloman*, 370 F.3d at 1286. *See ACLU v. Rabun Cnty. Chamber of Commerce, Inc.*, 698 F.2d 1098, 1111 (11th Cir. 1983) (even if government's "purpose for constructing the cross was to promote tourism," it "may not 'employ religious means to reach a secular goal.'") (citation omitted).

The District's "use of a religious [venue] where one is not necessary evidences a religious purpose." *Am. Humanist Ass'n v. Lake Elsinore*, 2014 U.S. Dist. LEXIS 25180, *22 (C.D. Cal. 2014). There are numerous viable secular venues, including the District's stadiums and gyms, the facilities at BRHS and BRMS (3 miles away), and Bi-Lo center (J.A.408-409; 732-739). BRMS holds its "8th Grade Awards" in its auditorium, and its graduating class is nearly double that of MVES. (*Id.*).

The school in *Elmbrook* claimed that it selected the church because its gyms were crowded and overheated. 687 F.3d at 845 n.2, 855. It contended that "although other venues are available for graduation, none is as attractive as the Church, particularly for the price[.]" *Id.* at 848. The Seventh Circuit concluded that an "observer could reasonably conclude that the [School] District would only choose such a proselytizing environment" despite "the existence of other suitable graduation sites—if the District approved of the Church's message." *Id.* at 854. The same is true here.

## C. **The Chapel Policy fails the Coercion Test.**

It is apodictic that no government entity "can force [or] influence a person to go to or to remain away from church." *Everson v. Bd. of Educ.*, 330 U.S. 1, 15 (1947). "Compulsory church attendance was one of the primary restrictions on religious freedom which the Framers of our Constitution sought to abolish." *Anderson v. Laird*, 466 F.2d 283, 286 (D.C. Cir. 1972) (Bazelon, J., concurring). As such, the Establishment Clause is clearly violated when, as here, "the government directs students to attend a pervasively Christian, proselytizing environment." *Elmbrook*, 687 F.3d at 855.

The Chapel Policy undoubtedly fails the coercion test. *Id.* at 854 ("In addition to impermissibly endorsing religion, the District's decision to use Elmbrook Church for graduations was religiously coercive"). The Seventh Circuit

held that the church venue failed the coercion test, even though no prayers were delivered. *Id.* at 847, 851. The same was true in *Enfield*, 716 F. Supp. 2d at 200-01. "[S]ome believers see entering a church as a religious act in itself." *Id.* Viewed "through this lens," holding graduations in Turner Chapel "not only can be viewed as coercing students to enter a church and 'support or participate in religion,' but can also be viewed as coercing the violation of one's own religious beliefs." *Id.*

Students must enter Turner Chapel, a place where "evangelism" is a focus, and where students are exposed to "the gospel of Jesus Christ." (J.A.16¶17; 121¶17). It "is cruel to force any individual to violate his conscience in order to participate in such an important event." *Lemke*, 376 F. Supp. at 89. *See also Musgrove*, 608 F. Supp. 2d at 1305; *Spacco*, 722 F. Supp. at 842.

The Chapel Policy is, in some respects, even more coercive than gradation prayers. "In *Lee* and *Santa Fe*, the state did not require that individual students perform any act whatsoever, but instead merely required students to be exposed to others engaging in religious activity at secular venues." *Enfield*, 716 F. Supp. 2d at 200-201. The Chapel Policy, in contrast, "requires students to undertake the act of entering a place of religious worship." *Id.* The only way "to avoid the dynamic is to leave the ceremony. That is a choice, *Lee v. Weisman* teaches, the Establishment Clause does not force students to make." *Elmbrook*, 687 F.3d at 855-56.

## CONCLUSION

For the foregoing reasons, the District Court erred in denying Plaintiffs-Appellants' Motion for Summary Judgment and granting Defendant-Appellee's Cross-Motion. Plaintiffs-Appellants respectfully request that the Court REVERSE with instructions to enter judgment in favor of Plaintiffs-Appellants on all claims, and REMAND to determine the appropriate amount of attorney's fees and costs.[12]

## REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 34(a), Plaintiffs-Appellants respectfully request that this Court grant them oral argument on the issues presented by this appeal.

Respectfully submitted:

July 20, 2015

s/ Monica Lynn Miller
Monica Lynn Miller
American Humanist Association
1777 T Street, N.W., Washington, D.C. 20009
phone (202) 238-9088 / facsimile (202) 238-9003
mmiller@americanhumanist.org
CA 288343 / DC 101625

Aaron J. Kozloski, Fed. ID No. 9510
Capitol Counsel, LLC
P.O. Box 1996, Lexington, SC 29071

---

[12] *E.g.*, *Thompson v. Life Ins. Co. of N. Am.*, 30 Fed. App'x 160, 165 (4th Cir. 2002) ("We reverse the district court's grant of summary judgment for LINA and remand for the entry of judgment for the plaintiff and a determination of appropriate attorney's fees and costs."); *Capital City Real Estate, LLC v. Certain Underwriters at Lloyd's London*, 2015 U.S. App. LEXIS 9662, *21 (4th Cir. 2015) (same).

phone 803-748-1320 / facsimile 888-513-6021
aaron@capitolcounsel.us

**COUNSEL FOR PLAINTIFFS-APPELLANTS**

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,831 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft® Word 12.2.8 in 14-point font size in Times New Roman.

July 21, 2015

s/ Monica Lynn Miller
Monica Lynn Miller
American Humanist Association
1777 T Street, N.W., Washington, D.C. 20009
phone (202) 238-9088 / facsimile (202) 238-9003
mmiller@americanhumanist.org
CA 288343 / DC 101625

Aaron J. Kozloski, Fed. ID No. 9510
Capitol Counsel, LLC
P.O. Box 1996, Lexington, SC 29071
phone 803-748-1320 / facsimile 888-513-6021
aaron@capitolcounsel.us

**COUNSEL FOR PLAINTIFFS-APPELLANTS**

## CERTIFICATE OF SERVICE

I certify that on July 21, 2015, the foregoing document was served on all parties or their counsel of record through the CM/ECF system.

July 21, 2015

s/ Monica Lynn Miller

Monica Lynn Miller
American Humanist Association
1777 T Street, N.W., Washington, D.C. 20009
phone (202) 238-9088 / facsimile (202) 238-9003
mmiller@americanhumanist.org
CA 288343 / DC 101625

Aaron J. Kozloski, Fed. ID No. 9510
Capitol Counsel, LLC
P.O. Box 1996, Lexington, SC 29071
phone 803-748-1320 / facsimile 888-513-6021
aaron@capitolcounsel.us

**COUNSEL FOR PLAINTIFFS-APPELLANTS**